**UNITED STATES of America,**
**Appellee,**

v.

**Harry Britt BROWN, Jr., also known as**
**Harry B. Brown, Jr., Appellant.**

**No. 688–70.**

United States Court of Appeals,
Tenth Circuit.

July 14, 1971.

---

Richard B. Buhrman, Washington, D. C. (Johnnie M. Walters, Asst. Atty. Gen., Meyer Rothwacks, Crombie J. D. Garrett, John P. Burke, Washington, D. C., with him on the brief), for appellee.

Roger Sherwood, Wichita, Kan. (W. A. Kahrs, Wichita, Kan., with him on the brief), for appellant.

Before SETH, McWILLIAMS and DOYLE, Circuit Judges.

McWILLIAMS, Circuit Judge.

This is an income tax evasion case. Harry Britt Brown, Jr., hereinafter referred to as the defendant, was charged in a six-count indictment with attempting to evade income taxes for the calendar years of 1959, 1960 and 1961, and in connection therewith he was also charged with having willfully subscribed to false income tax returns for the same calendar years, all in violation of 26 U.S.C. §§ 7201 and 7206(1). Trial by jury resulted in guilty verdicts on each of the six counts. On appeal these several convictions were reversed on the ground that the trial court had erred in excluding transcripts of the sworn oral testimony of defendant's business superior taken by the Government in ex parte investigative proceedings. United States v. Brown, 411 F.2d 1134 (10th Cir.).

Retrial of the case was to the court, sitting without a jury, the defendant waiving trial by jury pursuant to Fed. R.Crim.P. 23(a), but requesting that in addition to general findings the trial court also find the facts specially as provided for by Rule 23(c). The second trial culminated, as did the first one, in a judgment of guilty on all six counts. The defendant now appeals for a second time his several convictions.

For general background information, see our earlier opinion in this matter. As indicated therein, the defendant was employed for the years here in question, and for many years prior thereto, in the advertising department of the Wichita Eagle, a newspaper. In an effort to gain advantage in its highly competitive struggle with a rival newspaper, the Eagle engaged in the practice of trading advertising space in its paper in exchange for merchandise and services of the advertiser. This practice of so-called "trade outs" was used to a limited degree prior to 1954, but from 1954 to 1961 was apparently used on a rather large scale. For example, in 1959, 1960 and 1961 the total value of the merchandise and services received by the defendant from those placing advertising in the Eagle was approximately $70,000, no part of which was reported by the defendant as income. Nor was said sum, or any part thereof, reported by the Eagle during the years in question as income, although sometime

later it did file amended returns for the years in question which reflected a portion of such sum as income.

The defendant's basic position is that the merchandise and services thus received did not represent taxable income because he at all times had an agreement to reimburse the Eagle for any property received by him which was not used in the business of the Eagle. Indeed, this is the nub of the controversy: the existence or nonexistence of an agreement between the defendant and the Eagle that the defendant was obligated to reimburse the Eagle for the value of merchandise and services received by him in exchange for advertising space in the Eagle. The Government and the defendant both agree that the former as a part of its overall burden of proof had the burden of showing, prima facie, that there was no such agreement to reimburse. In this regard the Government concedes that if its evidence is legally insufficient to support the finding of the trial court that there was no such agreement, then the convictions must be reversed. However, the Government's position is that the evidence on this point is sufficient to support the trial court's finding.

■ Conversely, the defendant's position is that the evidence on this point is insufficient. According to counsel, the only "affirmative" testimony on this phase of the controversy comes from the defendant himself, who testified that he was at all times obligated by oral agreement to reimburse the Eagle for the value of the merchandise and services received by him in exchange for advertising space in the Eagle. Counsel emphasizes that the defendant's testimony as to the existence of such an agreement to reimburse was corroborated by the sworn statements of his business superior given an agent of the Internal Revenue Service and that this was the sum total of the evidence on this particular matter. On this state of the record, argues the defendant, his convictions must be reversed. We do not agree. In our view of the record the facts and circumstances are such as to support the deter-mination by the trial court that the defendant was not by any agreement obligated to reimburse the Eagle for the value of merchandise and services thus received and that accordingly such value did represent taxable income to the defendant. In other words, the defendant's testimony on this point did not resolve the matter, and this is true even though the sworn testimony given the Internal Revenue Service by the defendant's superior tended at least in some degree to support his theory of the case. Rather, such testimony merely raised a disputed issue of fact that has now been resolved by the trier of the facts, namely, the trial court.

Some excerpts from the detailed findings of fact made by the trial court will hopefully point up the nature and flavor of the controversy. The trial court found, inter alia, as follows:

"3. To place the newspaper in a better competitive position with a rival newspaper, The Wichita Beacon, Clyde W. Speer, Executive Vice President and Treasurer of The Eagle, authorized his son, Jack Speer, Business Manager; Royce Sehnert, Credit Manager; and the defendant to trade advertising in The Eagle to local merchants, retailers and contractors in Wichita in exchange for merchandise, goods and services. This was known in the business as a trade out. This practice was known to and approved by the Board of Directors.

"4. The defendant, Jack Speer and Sehnert did not turn over to The Eagle all of the merchandise and goods or the value of the services rendered by the merchants, retailers and contractors, but instead converted them to their own personal use. The value of the property and services so received by the defendant, personally, and not turned over by him to The Eagle, amounted to $25,133.66 in 1959, $34,947.14 in 1960 and $8,183.32 in 1961. These amounts were made up in part of carpeting, drapes, furniture, Buddha statuary, sweepers, pillows and pads, and labor for a train table and playhouse from House of Carpet; and RCA TV, Amana Freezer and Westing-

house Refrigerator from Superior Appliance Company; TV sets, stereo sound equipment and installation and phonograph records from Stark Suburban Sound, all to furnish the defendant's personal residence. A water softener was installed at the defendant's personal residence by Culligan Soft Water Company; termite control service for defendant's personal residence was obtained from Interstate Exterminators; the personal residence was remodeled by McCluggage, Inc.; defendant's personal furniture was repaired and upholstered by Riddel Furniture; the furnace and air conditioning equipment at defendant's personal residence was serviced by J. H. Bowman Co.; and the grounds surrounding the personal residence were beautified by shrub planting, tree and hedge trimming by Reid Brothers Tree Surgery.

"The defendant received various automobiles from dealers by way of trade outs. He took title to these cars in his own name, used the cars for personal driving, had them serviced and repaired under service and repair accounts based on trade outs, and when the cars were sold the defendant used the sale proceeds as he saw fit. He received guns, ammunition, bicycles, bicycle repairs and licenses, lawnmowers and lawnmower repairs, etc., from Midwest Sport Shop as a result of trade out transactions.

"5. The trade outs were not reported on the initial corporate income tax returns of The Eagle for the years 1959, 1960 and 1961. The defendant did not report on his income tax returns for the years 1959, 1960 and 1961 as income, the value of the merchandise, goods and services he had received as a result of the trade out transactions and retained for his own personal use. However, on personal property tax statements to Sedgwick County, Kansas, signed and filed each year, the defendant listed as his personally owned property the automobiles and other personal items so obtained. These personal property tax statements were signed by the defendant under oath. The automobiles, carpets and other personal items on the personal property

statements received a valuation by the assessor and the defendant paid taxes on the assessed value. On his income tax returns for the years 1959 through 1961 the defendant claimed deduction for personal property taxes paid, and for automobile licenses purchased."

\* \* \* \* \* \*

"8. It was the defendant's contention at the trial that the merchandise, goods and services he received by way of trade outs were promotional expenses of The Eagle and that he had an agreement with Clyde Speer to repay to The Eagle the value of any trade out items received by the defendant from advertisers and determined by the auditors to be personal to the defendant. The testimony of the defendant and of Clyde Speer that there was such an understanding or agreement is not credible, and I do not believe it. Nor do I believe that there was such an agreement.

"9. The property and services referred to in Finding No. 4 were received by the defendant and used by him for his personal benefit and their value was additional compensation to him and taxable to him for the year in which received by him."

■ The essential elements in a charge brought pursuant to 26 U.S.C. § 7201 are " \* \* \* willfulness; the existence of a tax deficiency \* \* \*; and an affirmative act constituting an evasion or attempted evasion of the tax \* \* \*." Sansone v. United States, 380 U.S. 343, 85 S.Ct. 1004, 13 L.Ed.2d 882. As concerns an indictment under 26 U.S.C. § 7206(1), " \* \* \* the gist of the offense is a false statement, willfully made, of a material matter." Kolaski v. United States, 362 F.2d 847 (5th Cir.). And the Government of course has the burden of proving every essential element of a crime beyond a reasonable doubt. Small v. United States, 255 F.2d 604 (1st Cir.). As above indicated, the Government concedes that as a part of its burden of proof it has the burden of showing, prima facie, that the defendant was under no agreement to repay the Eagle the value of the merchandise and services

received by him from those placing advertisements in the Eagle in exchange therefor, and that such merchandise and services constituted taxable income of the defendant. The Government contends that it has met this burden by circumstantial evidence, if not by direct evidence. We agree.

Counsel argues that the Government failed to present "affirmative evidence" that an agreement to repay did not exist, and thus failed to prove that the defendant received taxable income. Just how the prosecution could be expected to produce affirmative or positive evidence of the nonexistence of an agreement is a bit difficult to fathom. In any event, it is well established that the commission of a crime may be established by circumstantial evidence, as opposed to direct evidence, and we have held that a judgment and conviction which is based solely on circumstantial evidence cannot be objected to on that ground alone. Myers v. United States, 415 F.2d 318 (10th Cir.); Williams v. United States, 371 F.2d 141 (10th Cir.); and Jenkins v. United States, 361 F.2d 615 (10th Cir.).

Much of the evidence presented by the Government was so-called "direct" evidence, though admittedly the evidence as to the nonexistence of any agreement by the defendant to reimburse the Eagle was in the main circumstantial in nature. We now briefly review the facts and circumstances which in our view permit the inference that the defendant in 1959, 1960 and 1961 did not have an agreement with the Eagle to repay the sums here in question and supports the trial court's finding of no such agreement: (1) There was no written agreement to repay between the defendant and the Eagle; (2) the defendant kept no records, as such, of the merchandise and services thus received by him; (3) though the extent of the records of trade outs kept by the Eagle was in some dispute, certainly any records of defendant's trade outs were inadequate and sketchy, at best, as evidenced by the fact that when the entire matter "broke" after an independent audit of the Eagle's books revealed the extent of the trade out practice, it took months thereafter to gather supporting data in order to determine the total value of merchandise and services received by the defendant; (4) the defendant never made any payment pursuant to his alleged agreement to repay until after the aforesaid audit, at which time he borrowed some $90,000 to repay the Eagle, at the same time stating by letter, however, that the trade out deals were never "intended to subject me to any additional accounting"; (5) defendant was fired from his employment with the Eagle apparently over the entire incident; (6) the very sizeable amount involved and coupled with the considerable passage of time, i. e., at least from 1954 to 1962, during which time defendant made no repayments; and (7) the listing by defendant of certain items thus received by him as being his property for the purpose of personal property tax.

Without going into further detailing of the evidence, we conclude that the facts and circumstances are such as to permit the inference that the defendant did not have any agreement with the Eagle to repay the value of merchandise and services received by him, and that the defendant's evidence that there was such an agreement was purely an afterthought which came into being as the result of the audit of the Eagle's books and was thought to be the best way out of a bad situation. Accordingly, we hold that the record does support the finding by the trial court that there was in fact no agreement to repay between the defendant and the Eagle and that the value of the merchandise and property received by defendant in trade outs represented "additional compensation to him and taxable to him for the year in which received by him."

As a corollary of his main argument, counsel takes exception to the observation of the trial judge that the so-called "testimony" of defendant's business superior, Clyde W. Speer, as given the Internal Revenue Service, was not credible and that he did not believe it. Under the

circumstances we are not inclined to set aside the trial court's appraisal of this particular testimony, assuming only for the sake of argument that under British America Assur. Co. of Toronto, Canada v. Bowen, 134 F.2d 256 (10th Cir.), we would be permitted to so do. Actually that case is distinguishable from the instant one in that Speer's testimony to the Internal Revenue Service is but a part of the total evidence bearing on this particular facet.

It could well be argued, as indeed it has been, that by our prior opinion we have already held that the prosecution's evidence is sufficient to warrant submission of the case to the jury. In our earlier opinion we observed as follows:

"* * * It was stipulated that in 1959 Brown traded advertising space in the Eagle with numerous local merchants and service companies and personally received in return merchandise and services of the value of $25,133.66; for 1960, the amount was agreed to be $35,066.98 and for 1961, $8,063.48. Brown neither reported nor paid tax on these amounts, nor did the Eagle, and the supporting evidence, viewed in the light most favorable to the government, was clearly sufficient to establish that Brown participated in the concealment of the transactions from some of his superiors and completely satisfied the burden of the government to establish the fact of a tax due and the appellant's wilful attempt to evade or defeat the tax * * *. We reject, therefore, appellant's contention that the court erred in submitting the case to the jury and pass to a consideration of the claims made by appellant that procedural errors required that a new trial be ordered."

Counsel for the defendant counters by claiming that the record in the instant case is far different from the record made in the first trial. However, it is unnecessary to make a minute comparison of the records as made upon the first and second trial of the case, as our review of the present record convinces us that the findings and conclusions of the trial court do find adequate support in the evidence adduced upon the retrial of the matter.

Judgment affirmed.