**UNITED STATES of America, Plaintiff,**

v.

**Michael LONDE, Defendant.**

**No. 77–80Cr(3).**

United States District Court, E. D. Missouri, E. D.

May 9, 1978.

David W. Harlan, Asst. U. S. Atty., St. Louis, Mo., for plaintiff.

John J. Stewart, Clayton, Mo., for defendant.

MEMORANDUM

NANGLE, District Judge.

Defendant Michael Londe is charged in a two-count indictment with failing to file an income tax return during the calendar year 1970, and with filing a perjurious tax return during 1971. 26 U.S.C. §§ 7203, 7206(1).

Having waived a jury, the parties tried this cause to the Court. Although no request was made pursuant to Rule 23, Federal Rules of Criminal Procedure, the Court hereby makes the following findings of fact and conclusions of law:

The evidence established that from the end of 1969 until an arrest in 1972, defendant engaged in an elaborate "Ponzi scheme"

or confidence game. For a description of a "Ponzi scheme", see *Cunningham v. Brown*, 265 U.S. 1, 7–8, 44 S.Ct. 424, 68 L.Ed. 873 (1924). Defendant represented to friends, acquaintances, and various relatives that, because of his expertise and connections in the first aid field, he was able to purchase ambulance "shells" direct from the factory, equip them himself, and sell the finished ambulance to municipalities or companies at a substantial profit. He promised to share this profit with others if they would loan him money to purchase the original vehicle. Defendant promised to repay his investors, usually within one month, their original investment and anywhere from 10% to 50% interest. During approximately a two year period, defendant had collected funds totalling $1,900,000.00 from at least sixty-two individuals. Although the funds given to defendant by the investors were often termed "loans" and were sometimes supported by promissory notes, the Court finds that they were not true loans since the funds were obtained by fraud and defendant recognized no obligation to repay. The ambulance business was non-existent, and the evidence indicates that the defendant used the "loans" for his own purposes.

In his statement made to Internal Revenue Service agents, defendant maintained that he did not initiate the ambulance "business enterprise" but merely served as a conduit to a company which supplied emergency vehicles. Defendant stated that a Russell Decker, who was employed by International Harvester Co., planned and directed all aspects of this business. Defendant claimed to do no more than solicit funds, send them to Decker and disburse profits returned. Defendant claimed that Decker refused to return investments and defendant and the other investors lost money.

The evidence adduced totally belies this statement. The records of the companies which defendant contended were supplying him with vehicles established that these companies never dealt with defendant. None of the individuals at International Harvester, with whom defendant claimed to have a connection, ever heard of defendant.

Moreover, none of these individuals were even employed in the division of International Harvester which dealt with the type of vehicle involved. Despite the extensive business dealings which defendant professed to have had with Decker, defendant had no record of any correspondence with Decker. Defendant claimed to have spoken at one point in time with Decker's secretary; Decker never had a secretary. Defendant claimed to have called Decker on Decker's unlisted telephone number, but Decker had no such number. Defendant claimed that at Decker's request, all money sent to Decker by defendant was to be in the form of cashier checks made out to defendant and endorsed over to Decker. Defendant, however, had no copies of the checks or the stubs from the purchase of such checks. There are no deposit records of the checks supposedly sent by Decker to defendant, allegedly because defendant cashed all such checks. Defendant never noticed whose signature was on the checks or on what bank they were drawn.

Numerous investors, who became suspicious of defendant's story, attempted to verify his statements as to the suppliers of the vehicles and the purchasers of finished ambulances. In all instances, the investors were told by the companies and alleged customers that they had never heard of Michael Londe. In one instance, defendant produced documents for several investors which purported to show his affiliation with Superior Coach Sales Co., a reputable emergency vehicle manufacturer. Defendant stipulated at trial, however, that he had written the signatures, which were supposed to be of the various officers of that company, on the documents himself. He also used the deceptive name of Superior Coach Sales & Service, Inc.

Throughout the two-year period, defendant gave different investors contradictory accounts concerning the specifics of his enterprise, including the identity of his customers, from whom he was buying the vehicles, why he did not borrow from conventional financing sources and why he was unable to repay investors on schedule. As

to the latter, he gave at least twenty-two different reasons, ranging from the need to care for his mentally ill and suicidal brother to the fact that the son of the person who was to deliver his money had been in a motorcycle accident and needed to have his arm amputated.

In addition, numerous misrepresentations made to investors establish the fraudulent nature of defendant's scheme. Defendant stated to Internal Revenue Service investigators that he never received automobiles at special discounts. Yet, six investors testified that they initially invested with defendant because of his promise that, in addition to the return of their principal, they would receive new automobiles free or at no charge. These investors testified that defendant said he was able to obtain these good deals because of his many purchases of ambulances from automobile manufacturers. The representatives of two automobile manufacturers involved testified that these types of special discounts and commissions were never given by the companies and were against company policies.

Defendant stated that he never gave advice to investors as to the tax treatment to be afforded to the profits they would allegedly receive. Yet, six investors testified that defendant told them there was no need to report their profits. Defendant said that he was not going to report his income and that he saw no reason for these investors to do so. He also told them that the transaction was in cash so that there was no need to report it. He said that as there were no records of the profits, there was no need to report the income.

During the period of this scheme, defendant's financial status and spending habits took a remarkable turn for the better. While defendant had stated that he received no income in his position as head of the Medical Reserve Rescue Service, a position he held until 1972, he represented his income in this position as $8,000.00 and $25,000.00 on three separate occasions between 1969 and 1971. Despite the fact that he declared no income in 1970 and $28,036.00 in 1971, defendant admitted to the purchases of $1,000.00 in jewelry, $6,000.00 in furs, $2,000.00 in furniture, two homes on which he paid $33,900.00 in cash, and several new automobiles. In 1970, the personal expenditures from the seven checking accounts held by defendant and his wife totaled $47,994.00; in 1971, the amount was $40,432.00.

Defendant attempted to explain his increased financial status in 1970 and 1971 by claiming that family and friends had given him several large gifts of money. The evidence, however, refutes such claims. While defendant asserted that his father gave him between $15,000.00 and $17,000.00, the evidence established that at the time, his father had assets of only $4,125.00. Defendant asserted that his cousin and uncle had given him $11,000.00 as a gift; both individuals denied the same at trial. Defendant also claimed that a friend, who has since died, gave him $15,000.00. Her attorney, however, who handled all of her financial dealings while she was alive, denied that such a gift had been made. Defendant also claimed that this same individual in effect gave him $22,000.00 by guaranteeing a bank loan, on which he later defaulted. Purportedly, this sum was to be used in a joint business venture between the two. The evidence showed that this business never existed and that defendant had in fact considered starting the same business with another friend but had abandoned the idea.

The evidence also established that defendant had no intention of repaying the loans. He only repaid those loans necessary to preserve his scheme. He insured that the complainers, and the investors who were recruiting other investors, were paid back, some with a profit. With the exception of these investors, defendant's behavior belied any intent to repay. He gave notes signed in blank to one investor to distribute to investors as they paid in. He gave an endless series of reasons for not repaying as promised. He continued to recruit new investors after he explained to other investors that someone at International Harvestor had stolen all of the funds invested. He signed false joint venture agreements with some investors. In June 1971, during the

middle of this scheme, he stated on a City Bank financial statement, in response to a specific question, that he had no unsecured notes payable. Thus, the Court finds that defendant had no intention of repaying his investors as promised.

The evidence established that defendant did not file a tax return in 1970. Indeed, defendant admitted the same on his 1971 tax return. Defendant asserted that the failure to file was the fault of defendant's Certified Public Accountant, Bernard Eder. Defendant claimed that he had signed blank 1970 tax returns and understood that Eder would complete the returns and mail them. Eder, however, testified that he never received the forms, that it was against office policy to follow the procedures claimed by defendant, and that a search of his records showed that he had not prepared such a form for defendant.

■ Defendant is charged in Count I of the indictment with willful failure to file an individual income tax return in 1970, in violation of 26 U.S.C. § 7203. In order to convict defendant of such a charge, the government must establish, beyond a reasonable doubt: (1) that defendant was a person required by law to file a return for the taxable period; (2) that he failed to file a return at the time required; and (3) that the failure was willful. *United States v. Matosky,* 421 F.2d 411–412 (7th Cir. 1970); *United States v. Ostendorff,* 371 F.2d 729, 730 (4th Cir. 1967); *United States v. McCormick,* 67 F.2d 867, 868 (2d Cir. 1933).

■ The evidence established that defendant had a gross income of $114,293.00 in 1970. Defendant admitted that he had sufficient income to warrant the filing of a return and he knew that he should file. Internal Revenue Service records established that defendant failed to file a 1970 return. The Court further finds that defendant's failure to file was willful. Defendant's attempt to shift blame to his Certified Public Accountant, his admission in 1971 that he did not file a 1970 return, and his statements to several investors that he was not reporting his profits all support this conclusion. Accordingly, the Court concludes that the government has met its burden and that defendant is guilty as charged in Count I of the indictment.

■ Count II of the indictment charges defendant with filing a perjurious return in 1971 in violation of 26 U.S.C. § 7206(1). The government must establish beyond a reasonable doubt that defendant filed a false tax return which defendant knew to be false as to a material matter. *United States v. Brown,* 446 F.2d 1119, 1122 (10th Cir. 1971); *Blumenfield v. United States,* 306 F.2d 892, 895 (8th Cir. 1962). Defendant reported a gross income of $28,036.00 in 1971 while the evidence showed that he received an additional $252,012.09 in gross income. Clearly, defendant's 1971 return was false as to a material matter. *Hoover v. United States,* 358 F.2d 87, 89 (5th Cir. 1966); *United States v. DiVarco,* 343 F.Supp. 101, 102 (N.D.Ill.1972), *aff'd,* 484 F.2d 670 (7th Cir. 1973); *cf. United States v. Null,* 415 F.2d 1178, 1181 (4th Cir. 1969).

The Court further finds that defendant's failure to report his income accurately was willful. The gross disparity between what was earned and what was reported supports this finding. Additionally, statements made by defendant to various investors compel such a finding. Before filing his 1971 return, defendant told one investor, Rex Bills, that "he [defendant] kept a low profile, and he did not have much income through preceding years and he was not going to be reporting all of this as income, that he kept money in a safe deposit box".

Defendants has raised several defenses, none of which this Court finds to have merit. Defendant claims that the Internal Revenue Service failed to follow reasonable "leads" furnished to it by defendant. Specifically, defendant contends that the Service failed to secure Russell Decker's financial records. The Court finds that, given all of the evidence refuting defendant's alleged connection with Decker, defendant's lead was not reasonable and did not warrant follow-up beyond the production of Decker as a government witness. Defendant's claim that his increased financial status in

1970 and 1971 was due to gifts of money from family and friends is totally belied by the evidence. Defendant's claim that he had given all the necessary information for the filing of his 1970 return to his Certified Public Accountant fails to find any support in the evidence.

■ Accordingly, the Court concludes that the government has established beyond a reasonable doubt that defendant derived economic benefit from the scheme, that he had no intention to repay the investors beyond what was necessary to preserve the scheme, and that he knowingly filed a false return in 1971. As stated previously, the Court concludes that defendant willfully failed to file his 1970 income tax return. Therefore, the Court finds defendant guilty as charged in Counts I and II of the indictment.