UNITED STATES of America

v.

Ruth M. ANDERSON.

Crim. No. 80–176.

United States District Court, W. D. Pennsylvania.

April 1, 1982.

Sandra D. Jordan, Asst. U. S. Atty., Pittsburgh, Pa., for plaintiff.

George E. Schumacher, Federal Public Defender, Pittsburgh, Pa., for defendant.

## OPINION

ROSENBERG, District Judge.

This matter came before me for trial non-jury of the defendant, Ruth Anderson, who was charged with the criminal offenses of attempting to evade or defeat income tax payments.

The grand jury had charged in a two-count indictment that the defendant Anderson did willfully and knowingly attempt to evade and defeat a large part of the income taxes due and owing by her to the United States of America for the calendar years 1975 and 1976, by preparing, signing, mailing and filing false and fraudulent income tax returns, wherein she knowingly understated her taxable income for the above years, and knowingly underpaid the income taxes due and owing thereon in violation of § 7201[1] of the Internal Revenue Code.

The Government showed by Exhibits LL and KK, and the uncontradicted testimony of revenue officer, Kenneth White, that the defendant, an elderly bookkeeper for Micro-T, Inc., reported her income for the year 1975 as $9,620.00 and that she asserted the amount of tax due and owing thereon was $1,376.00. After reporting the sum of $1,513.00 as being previously withheld from her pay, she then claimed a refund in the amount of $137.00. The defendant reported income for the year 1976 in the amount of $6,349.00, and asserted the amount of tax due and owing thereon was $588.02. After reporting the sum of $1,018.60 as being previously withheld from her pay, she again claimed a refund this time in the amount of $430.58. The Government alleged that the defendant caused thousands of dollars of Micro-T, Inc. checks to be issued for her own economic benefit, and that she failed to report all this as income.

The defendant Anderson was employed by Micro-T, Inc. as a bookkeeper and office manager from December, 1973 until August, 1976 at a salary of ultimately $200 per week (or $10,000 annually). Her duties included general office management, preparing books of original entry such as accounts receivable and accounts payable, deducting and withholding various taxes and other charges, and making payroll and expense checks.

1. § 7201 provides that "Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $10,000, or imprisoned not more than 5 years, or both, together with the costs of prosecution. (26 U.S.C.)

Micro-T, Inc. was in the business of constructing radio antennas and microwave towers. During the years 1974–1976, there were four corporate officer-owners: Robert Fay, President; Donald Wood, Vice-President; Alton Kester, Vice-President, and Donald Lee, Secretary. Fay was the major financial backer and was rarely present on corporate premises. Lee, who was a lawyer by profession, also was not frequently present. Only Wood and Kester performed the job functions at the Micro-T offices on a day to day basis, with Wood being responsible for the field employees' time, payroll and equipment, and Kester being responsible for general management, engineering, and bidding on jobs. Micro-T's corporate headquarters is located on Freeport Road, Blawnox, Allegheny County in the Western District of Pennsylvania.

The defendant Anderson was hired by the president of the corporation as a bookkeeper and office manager in December 1973. In very short order they entrusted the defendant with complete confidence and relied upon her as a dependable person in the performance of all these duties.

The defendant was not authorized to decide which bills or expenditures were to be paid by corporate checks (other than minor office expenditures). Rather, each disbursement was required to be approved by an officer of the corporation, usually Kester for expenses, or Wood for payroll.

The defendant was entrusted with the drafting, making, issuing, mailing and recording of the checks of the company. All checks of the company were unnumbered. It was the defendant's function to number each check as she typed them. The company also maintained a checkwriter and a slug bearing "the authorized to pay" signatures of two company officers. The checkwriter was kept outside of the safe but the slug was kept in the safe when not in use. The defendant was given the combination to the safe and authority of access to the slug for insertion in the checkwriter as needed with implicit reliance upon her to use the slug only for authorized company expenditures and prevent the unauthorized use of the slug by anyone, other than an officer who occasionally used it. Each month she received the cancelled checks and the bank statements from the Union National Bank, the check fund depository, and reconciled them without any supervision of the officers.

The defendant prior to her resignation pointed out to Wood, one of the officers, and later to the Board of Directors, that another officer, Kester, was making what she believed to be inflated demands for expense allowances. On occasion she threatened to notify the Internal Revenue Service of violations of the Internal Revenue Code. The Board of Directors concluded that her allegations were without substance.

After the defendant resigned in August, 1976 she was asked by the president to come back and help out for a day or two, and this she did. Her replacement had difficulty in reconciling the bank statements sent by the Union National Bank and because of this, request was made from that bank for examination of its microfilms for a considerable period in the past. This was because many of the checks were "missing" and the cash balance was short from that indicated in the records of the company.

The microfilm examination lead to the discovery that a large number of "duplicate numbered" checks (checks to other hitherto unrecorded payees with duplicate numbers) were used. None of these cancelled duplicate numbered checks, divulged in the microfilms, were in the company files, nor recorded in the corporate books, with no explanation of what had become of them. Each of the revealed duplicate numbered checks was either for the payment of products or services for the benefit of the defendant, her sister, or son (in two different instances), and not ever for the corporation. In other words, the missing duplicate numbered checks in some way directly or indirectly related to the defendant, Ruth Anderson, as we shall presently see.

The critical fact is that the defendant did not make any one of these duplicate numbered checks a part of the corporate records

in the books of the company as the bookkeeper who had the sole responsibility to keep and continue to make entries as required and to balance out the cancelled checks when returned by the Union National Bank. In the evidence of the case, each hitherto undivulged duplicate check[2] was specially submitted to the officers, who had authority to make checks, to indicate what knowledge each had of such checks, and in each case the witnesses asserted they had no knowledge whatsoever of them. Furthermore, they testified that no authority was given to the defendant or anyone else to make, issue or negotiate these duplicate numbered, corporate unrecorded and previously unrevealed checks, and that none of the products or services for which the checks were issued were for the benefit of the corporation.

Approximately 50 undivulged duplicate, unrecorded checks or groups of checks were issued by the defendant for her economic benefit or that of her sister or son. These were admitted into evidence without objection. When the defendant decided to issue an unauthorized and unrecorded check, she first used a legitimate business check for an authorized expenditure and numbered it. At the same time she made another check, which was unauthorized, and gave it the same number as the legitimately authorized check, using this duplicate numbered check to purchase something for herself. These checks as the evidence showed, beyond any reasonable doubt, were negotiated into the defendant's own personally-benefitting channels. Since the defendant also received the monthly bank balance statements and the cancelled checks, when the defendant left the employment, no unauthorized, duplicate numbered, cancelled checks were found with the other business checks which she handled in the two relevant years.

It is inconceivable that the bank would not have returned all the relevant checks, especially when it had recorded indifferently all the authorized and unauthorized checks for these years in the past on microfilm. It is unbelievable that the bank would have, or could have had, any reason—which might have been shown if it did—to remove the duplicate numbered Anderson-benefitting checks from all the others which it sent back with the balance sheet to the checkmaker. In any event all the balance sheets for the past two years should have revealed the duplicate checks. The balance sheets and the cancelled checks came back to the company's bookkeeper in the performance of her duties. That bookkeeper was uncontradictably Ruth Anderson, the defendant. The conclusion is obvious, since Mrs. Anderson was in complete control of these records, that she had withdrawn all the duplicate checks from the corporate files. It became apparent only when these unauthorized and unrecorded checks were discovered on microfilm that the defendant might have removed them, since she was the only one who handled them when the Union National Bank returned monthly cancelled checks. As such, she would have had to do this without authority and surreptitiously.

Set forth here are a few of the payees of these cancelled duplicate checks, which the defendant admitted were for her benefit, or that of her family. These show a factual situation as a foundation upon which a determination must depend. While the checks pertain to the interest of the defendant and as some of them bear the defendant's name, and while the evidence connects her personal interest in the bulk of them,[3] it is sufficient to detail only a few to exemplify the general character of all payees, amounts and purchases:

Exhibits G–1 and G–2. Canadian Fur Company, 1975 and 1976, defendant issued multiple company checks, to purchase for herself various fur coats, hats and capes of mink and other furs in the amounts of at least $3,795.20 in 1975 and $5,667.50 in 1976;

Exhibit P. Gimbels, 1975, defendant issued and endorsed a company check for

---

2. Copies of the Union National Bank's microfilms.

3. The defendant admitted this readily at her trial.

$457.00 to the jewelry department for a diamond ring;

Exhibit H–1. Carlton House, 1975, defendant issued a check for $2,280 of company funds to pay rent in this luxury apartment and hotel complex, where she lived, for *one year in advance*;

Exhibit R. Joseph Horne, 1976, defendant issued a company check to purchase a Hammond organ for herself in the amount of $2,332.00;

Exhibit A. Allegheny Cemetery, 1976, defendant issued a company check in the amount of $800.00 to purchase a mausoleum crypt for herself;

Exhibit C. Lila Anderson, 1975, defendant issued a company check in the amount of $60.34 for her sister; and

Exhibit D–1. Artcraft Mantle and Fireplace Co., 1975, defendant issued a company check in the amount of $1,887.00 to purchase a house improvement for her son, Charles Nebel.

Other checks were issued by the defendant for cash, merchandise and other personal services.

The payees of these checks, or representatives of the payees appeared in court and testified to the receipt of these checks for the commodities or purposes stated, and that none of these were transactions with the Micro-T corporation, or that they had any business with the company, but only with Ruth Anderson.

The defendant admitted using Micro-T corporate funds for these duplicate checks, and receiving (predominantly for herself and also for other family members) the resulting economic benefits therefrom. However, she defended in the first place on the basis that the use of these funds for these benefits to herself was actually authorized by the corporate official, Donald Wood, a vice-president.

As a further defense, she asserted that there had been friction between the two vice-presidents, corporate officers Wood and Kester, as a result of a suspicion she had raised with Wood that Kester was over spending corporate funds for personal use on his business trips. She testified that an agreement had been worked out between herself and Wood whereby she was to do considerable "overtime" home work investigating Kester's expense records for past years. She contended that after doing substantial work, Wood could not pay her in cash so he authorized her to use the corporate funds by way of the checks for her purchases. She testified that this work which she had volunteered to do was not without expectation of compensation. She alternately referred to this corporate money from the duplicate numbered checks, issued and used for her benefit as "gifts" from Wood in exchange for her "overtime" work. Therefore, she was not required to report this compensation as income.

According to the defendant, since Wood did not pay her in cash directly for her "overtime" work, and instead told her to use Micro-T checks and corporate funds to pay her rent and thousands of dollars worth of furs, an organ, a ring (along with all other goods and services), that these were not income to her but rather "gifts". Using the defendant's theory, the defendant could take no salary, use Micro-T checks to pay her for all her expenditures, large and small, and so have no "income" and no obligation to pay Federal taxes.

The defendant never explained why she failed to record the cancelled duplicate checks in the company records when issued in the first place, since only she had total control and responsibility over the checks, particularly if they were indeed actually authorized by a corporate official. The defendant's evidence presents many other questions, some of which to an extent are raised in the defendant's case alone. In fact, her evidence accentuated these. For instance, how could the defendant believe that the money value (according to prosecution evidence) was somewhere near $50,000 for her services in uncovering a number of corporate checks against one of the owners claiming mixed incidental personal expenses as employment expenses? Why did the defendant fail to set forth the number of after-hours overtime (since she was a bookkeeper and record keeper) of time spent in

searching out the personal expenses of Kester? Why were the regularly numbered checks not used if they were for legitimate purposes (unless for the purpose of hiding the fact of their issuance)? Why would one of the owners of the corporation, a vice-president, be so liberal in spending approximately 25,000 odd dollars a year on the part-time service of an employee who received approximately $10,000 per year for full-time service? Why should part owner Wood pay $25,000, more or less, a year especially by numerous checks by way of gifts, to the defendant for divulging (if any such existed) nominal amounts such as Kester would have spent as a sales representative for the company? And most of all, what happened to the original duplicate numbered, cancelled checks written for the defendant's benefit? Why did she not set forth the cancelled duplicate checks returned, or not returned, by the Union National Bank in the company records in the same way as were the original numbered checks? And why did she not discuss the fact that she knew about these missing duplicate checks—or did not know about them—and explain, if she could or could not, what happened to them?[4]

If Mrs. Anderson's defense, as she stated it at the trial, was to be believed, she should have presented the answers to these questions, rather than the questions themselves. Instead she testified in random and contradictory fashion, and so lent more disbelief than credibility to her defense. Even if the defendant's story was believable, she has still not proposed a sufficient defense in terms of characterizing the company money used as "gifts". If she had alleged that Wood had authorized the use of these company funds with the intention of liberality and without expectation of compensatory services and not as a *quid pro quo* for anything she was doing for Wood, then perhaps this might, at least, have raised the issue of her credibility.

The total amount negotiated by these checks, as indicated in the evidence, was not reflected in the company's withholding tax records, and was unreported in the defendant's income tax returns for the years 1975 and 1976, as being sums received by her as proceeds for which accounting should have been had as income.

I find as a fact that the duplicate numbered checks issued and negotiated by the defendant herself were neither issued for the benefit of the company nor produced any benefit to the company. I also find that the previously stated duplicate checks were in sum and substance issued by the defendant, negotiated by the defendant and were productive of some kind of benefit to the defendant as having monetary value.

■ After considering all of the evidence as a whole, I find beyond a reasonable doubt that the corporate funds used by the defendant Anderson were not authorized or taken with the knowledge or consent of any corporate officer. I find further that, by the defendant's own admissions, these check-proceeds used for the herein outlined items were income to her and that she knowingly filed fraudulent income tax returns and evaded payment thereon by underpaying her income taxes and seeking refunds in each year.

The question before this court is: Why if the defendant received large sums of money in each of the two years, did she not pay income tax on the overtime earnings received and paid for by way of those duplicate numbered checks? It is not for this court to condemn the defendant for taking money from her employer, if she was not entitled to do so, nor to criticize her for the manner in which such funds were taken. The issue here is simply why did she not reveal the extra income to the IRS and pay any taxes which may have been due thereon.

■ The term "gross income" is defined generally in § 61(a) of the Internal Revenue Code of 1954 as "all income from whatever source derived", including "compensation for services".[5] I have found here that

---

4. She took the stand in her own defense, and so makes this a competent question.

5. § 61(a) provides that

the defendant Anderson was not authorized to take corporate funds for the duplicate numbered check purposes. Therefore, these funds were taxable as income since misappropriated funds are includable in "gross income" in the year in which the funds are misappropriated. *James v. United States*, 366 U.S. 213, 81 S.Ct. 1052, 6 L.Ed.2d 246 (1961).

Assuming, *arguendo*, the defendant's version of the facts, the money-compensation which she says she received for her overtime investigative or bookkeeping services is still gross income as defined by § 61(a) just as her daily work during regular hours produced pay and was gross income. But if the duplicate numbered checks in fact actually bought gifts for her, as she defended, while they may have been taxable as gifts, they would not be taxable as income under § 102(a); since the general rule is "Gross income does not include the value of property acquired by gift, bequest, devise or inheritance."

But they were not gifts. Her self-condemnation in the case is contained in many of her own words. Instances of some of these are shown here. When asked how much time the defendant spent on the alleged overtime work for Mr. Wood, the defendant Anderson answered

"Well, it was pretty near every night that I did it and on Saturdays." (Tr. pg. 518).

When asked about an agreement between the defendant and Wood regarding compensation for the alleged overtime work she did, the defendant answered:

"When it first started, he had agreed to pay me $200 a week for this extra work to get it done. But we worked all year, 1974, and I hadn't received a dime. He hadn't given me one cent. So, in 1975, I wanted to quit. So I told him I can't work for nothing. There's nobody that works for nothing. This is like an investigator's job and accountant's job and they make good money and I wasn't working for nothing.

So, he explained, he said, 'You understand with the money coming in, which can be verified by their bank recaps, that the money was short. Not that it wasn't due, coming in, it was just not there.' He said, 'I really haven't got the money to pay you like that.' So, I said, 'Well I am not going to do it for nothing.' And he said, 'Well, I'll try to give you little things here and there. Would you—I need your help.'"

(Tr. pgs. 519–520).

Thus the defendant identifies "this extra work" as a "job", for which she paid herself by a series of duplicate numbered checks, and which she eventually and alternately termed as "gifts", "little things here and there".

In *Hamberg v. Commissioners*, 400 F.2d 435, C.A. 9, 1968, the court held that a payment supported by a consideration cannot constitute a gift. Since the transferor in *Hamberg* had not acted from any sense of generosity, but rather for an economic benefit to herself, the transfer was not a gift. So, too, in the instant case, even assuming that the defendant's defenses were consistent and believable, neither the alleged giver, Wood, nor the taker, the defendant, acted for benign purposes in the performance of business services by the defendant and receiving business results by Wood. Therefore, the duplicate numbered checks were, admittedly by the defendant, consideration which paid for business services.

In *Commissioner v. Duberstein*, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960), the taxpayer provided sales leads to the president of a company which supplied the taxpayer. As a result of these valuable leads the president insisted that the taxpayer accept a new Cadillac. The taxpayer testified that he reluctantly accepted the car, not expecting a reward when he offered this

"Gross income defined. (a) General definition. Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items:

(1) Compensation for services, including fees, commissions, and similar items ...". (26 U.S.C.)

information; but that he did not think the car would have been sent to him if he had not furnished the leads. The Supreme Court held that the taxpayer had received taxable income. The Court relied on the holdings in a prior case that if payment proceeds primarily from "the constraining force of any moral or legal duty", or from "the incentive of anticipated benefit" of an economic nature, it is not a gift. *Bogardus v. Commissioner*, 302 U.S. 34, 41, 58 S.Ct. 61, 64, 82 L.Ed. 32 (1937); In *Roberts v. Commissioner*, 176 F.2d 221, C.A. 9, 1949, a taxi cab driver's tips were held to be income, and the court rejected a contention that they were gifts, because they were tied to the "service".

I weighed the credibility of the defendant in many ways, but one in particular impressed me unfavorably. The defendant testified that with some of the purchases which she made with Micro-T checks, she was accompanied by Wood. But particularly, she testified that when she purchased the fur coat or fur pieces, Wood was present, evidently approvingly. When the defense called these witnesses, but particularly Martin Rosenstock, owner of the Canadian Fur Company, he testified that the defendant made multiple purchases of furs, paid for with Micro-T checks. He testified further that according to his knowledge, Anderson was not accompanied by anyone on her visits to his store.

In the instant case, the duplicate numbered check funds used by the defendant could not be considered gifts, since they represented, by the defendant's own admissions, consideration or payment for services rendered which she allegedly performed. The defendant's testimony attempted to establish the presence of friendship between her and Wood, all of which Wood denied—but even if believed this evidence would be insufficient to support the contention that the corporate funds used by the defendant in the duplicate checks were gifts without the necessary and required element of a "detached and disinterested generosity". This was not present in the alleged transaction which the defendant herself characterized as payment for her services. *Commis-*sioner v. LoBue*, 351 U.S. 243, 246, 76 S.Ct. 800, 802, 100 L.Ed. 1142 (1956).

To convict a person for criminal income tax evasion under 26 U.S.C. § 7201 (Internal Revenue Code, 1954), the burden is upon the government to prove three elements: (1) the existence of a tax deficiency, (2) willfulness, and (3) an affirmative act constituting evasion or attempted evasion of the tax. *Sansone v. United States*, 380 U.S. 342, 351, 85 S.Ct. 1004, 1010, 13 L.Ed.2d 882 (1965); *Lawn v. United States*, 355 U.S. 339, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958); *Spies v. United States*, 317 U.S. 492, 63 S.Ct. 364, 87 L.Ed. 418 (1943); *United States v. Callahan*, 588 F.2d 1078, 1081, C.A. 5, 1979.

The existence of the first element, a tax deficiency was proved beyond a reasonable doubt by the government by overwhelming evidence of the accumulation of thousands of dollars of undeclared income to the defendant as a result of the duplicate numbered corporate checks which she made and negotiated for her benefit and which she admitted taking to the extent of thousands of dollars of Micro-T funds for such things as fur coats, jewelry and one year of rent, to repeat just three examples.

In order to establish the second element of the offense, willfulness, the government must prove beyond a reasonable doubt that there was an attempt to evade the tax, made voluntarily and intentionally and with the specific intent of evasion. *United States v. Swallow*, 511 F.2d 514, 520, C.A. 10, 1975; *United States v. Dowell*, 446 F.2d 145, C.A. 10, 1971, cert. den. 404 U.S. 984, 92 S.Ct. 448, 30 L.Ed.2d 368. The requisite intent may be drawn from circumstantial evidence alone if the proof is substantial. *United States v. Ramsdell*, 450 F.2d 130, C.A. 10, 1971; *United States v. Brown*, 446 F.2d 1119, C.A. 10, 1971. The filing of income tax returns with knowledge by the taxpayer that she should have reported more income than she did is enough for a finding of willful intent to defeat and evade the tax. *Sansone, supra*, 380 U.S. at pages 351 355, 85 S.Ct. at 1010–

1012. This element requires an awareness on the part of the taxpayer of the tax obligation; that an intentional rather than an inadvertant act or omission was involved; and that the behavior of the taxpayer was motivated by a specific intent to conceal in contrast to a genuine misunderstanding of the requirements of law or a good faith belief that the income was not taxable. *United States v. Martell*, 199 F.2d 670, C.A. 3, 1952; *United States v. Peterson*, 338 F.2d 595, C.A. 7, 1964.

The defendant contends that she believed that her "bonus check" was not income, and that she was so told by the lawyer, Secretary Lee or another officer, and that she was not required to declare it as income. But she does not say the same about the duplicate numbered checks and that she received the same advice regarding the funds taken by her by means of the duplicate numbered checks.

The defendant had been a bookkeeper for many years and responsible for keeping individual tax records of the employees as they related to their employment, which included all the ncessary withholding taxes by the employer, both federal and state. The defendant prepared her own tax returns but excluded the value of the duplicate check items, and in each of the two years actually applied for refunds. It is notable that she did know about making application for refunds which she obtained, but it is inconceivable that her failure to report thousands of dollars of value of duplicate checks in 1975 and 1976 was for the reason that she believed that the total of the proceeds of these checks made for her own benefit was tax free as gifts because it was not income, even though paid from the Micro-T treasury, and although allegedly authorized by Wood in exchange for "overtime work" which she stated she refused to do "for nothing". The evidence is uncontradicted that practically all of the duplicate checks were self-benefitting to the defendant, or her son or sister. Thus, her whole ambiguous version is inconceivable that she believed this Micro-T money received by her was tax free and that she did not knowingly and intentionally withhold income tax payment on the value of the stated duplicate numbered checks in each of the years, 1975 and 1976.

The final element necessary for conviction for a § 7201 offense is an affirmative act constituting an attempt to evade or defeat the tax. The conduct must amount to a willful and positive attempt to evade a tax in any manner or to defeat it by any means. It may involve concealment of assets or covering up sources of income, or handling one's affairs to avoid making records usual in transactions of the kind involved, or any conduct which likely effect would be to mislead or conceal. *Spies v. United States*, supra, 317 U.S. at page 499, 63 S.Ct. at 368.

The fact that the entire list of duplicate checks were withheld and unrecorded in the company's records issued in the years 1975 and 1976 and were shown as being returned cancelled by the Union National Bank and set forth in their balance sheets equally with all the original numbered checks in those years, while they were all within the conduct and functioning of the defendant as the company's bookkeeper, is conclusive evidence of a willful intent by the defendant to conceal the duplicate numbered checks issued and negotiated by her for her own benefit.

The fact that she obscured the issuing of all the duplicate numbered checks and opportunely knew nothing (since she said nothing about this in her defense testimony) about their missing from the cancelled checks, and disregarded the balance sheets returned periodically by the Union National Bank, and that she never mentioned the why or wherefor of this "phenomenom", makes such conduct acts of concealment on her part intentionally done.

The pointed pattern of circumstances is that all the duplicate numbered checks were self-benefitting; that they were all made and negotiated by the defendant; that the cancelled checks were missing and unaccounted for in both years, 1975 and 1976, and that all this was accomplished covertly with no explanation for the reason for any of such conduct.

The defendant's attempts to evade or defeat her lawfully owed income taxes for the years 1975 and 1976 were proved beyond a reasonable doubt. She had control of the means of taking the corporate money which she admitted she used. Further, she had the exclusive control of the records of the use of this money which she kept secret. She knew that the effect of her actions would be to receive substantial income and prevent the government from receiving the legal amount due. The evidence proved beyond a reasonable doubt that the defendant Anderson developed a method or scheme of concealing income taxes which she knew were legally owing thereon.

It is not necessary that I particularize each check and item for which the defendant received money value. It is sufficient as I have set forth that a substantial total accrued to the defendant in each year for which she should have paid income taxes and therefore sufficient to convict the defendant of the two counts in the indictment.[6]

While each of the two counts of the indictment in this case charges the defendant with willfully and knowingly attempting to evade or defeat a large part of the income tax due and owing by her to the United States of America for the calendar years, 1975 and 1976, respectively, and that she should have reported a much larger sum of taxable income in each of the said years, for which she failed to pay the taxes due on the difference as charged in the indictment for which no return was made, and even though the evidence proved that substantial amounts of those charges in the indictment were withheld from the returns in those years, the government was not obliged to prove the exact amount of tax evaded in each of said years. *United States v. Rischard*, 471 F.2d 105, C.A. 8, 1973; *Cave v. United States*, 159 F.2d 464, 468, C.A. 8, 1947. In other words, the government was not obliged to prove the entire amount alleged in the indictment in each of said counts, only a substantial amount. *United States v. Cole*, 463 F.2d 163, 167, C.A. 2, 1972; *United States v. Moore*, 360 F.2d 353, 357, C.A. 3, 1965; *United States v. Procario*, 356 F.2d 614, 615, 618, C.A. 2, 1966. The proof required to be presented by the government of the charges contained in the indictment is abundantly sufficient.

After considering all of the evidence as a whole, I find more than sufficient evidence and hold beyond a reasonable doubt that the defendant's failure to report those thousands of dollars of income in 1975 and 1976 was willful, knowing and intentional, and that the defendant is guilty beyond a reasonable doubt of the violations charged in the two counts of the indictment.

---

6. The findings of fact and conclusions of law are incorporated herein in accordance with Federal Rule of Criminal Procedure 23(c), Trial Without a Jury. "In a case tried without a jury the court shall make a general finding and shall in addition, on request made before the general findings, find the facts specially. Such findings may be oral. If an opinion or memorandum of decision is filed, it will be sufficient if the findings of fact appear therein."