**UNITED STATES of America**

v.

**Ruth M. ANDERSON.**

**Crim. No. 80–176.**

United States District Court,
W. D. Pennsylvania.

June 22, 1982.

Sandra D. Jordan, Asst. U. S. Atty., Pittsburgh, Pa., for plaintiff.

George C. Schumacher, Federal Public Defender, Pittsburgh, Pa., for defendant.

## OPINION

ROSENBERG, District Judge.

The defendant, Ruth M. Anderson, a bench trial convicted defendant, filed a Motion for Judgment of Acquittal and Motion for New Trial. By this pleading she charges (1) that she could not remember "of anyone telling her of her right to a jury trial until after the trial when the First Assistant Public Defender gave her that information"; and (2) that she was denied a constitutional right of a speedy trial because thirteen months elapsed between the beginning of the trial and of this court's filing of the Findings of Fact, Conclusions of Law and Opinion and verdict.

She was found guilty after a 7 day trial on two counts of the indictment charging her with wilfully and knowingly attempting to evade and defeat a large part of the income tax due and owing by her to the United States of America, for the calendar year 1975 as set forth in Count 1, and for the calendar year 1976 as set forth in Count 2. It also charged her with preparing, mailing and the like, of false and fraudulent income tax returns with the Internal Revenue Service for each of those years. The counts charged that in the calendar year 1975, she evaded paying the sum of $7,854.02, and in the calendar year 1976, she evaded paying the sum of $8,689.54.

Immediately following the filing on *April 8, 1982* of the instant motion for judgment of acquittal and for a new trial, this court scheduled the matter for argument on *April 28*. Counsel in his brief made the statement that "she desires to present testimony before this Court at the time of the argument on April 28, 1982 that she did not waive her right to a jury trial . . .", That request in the brief was allowed and the court heard not only the argument of counsel but heard all the witnesses who might have given any evidence which would clarify and settle the issues raised by the defendant.

Because the defendant's counsel had a nose bleed on April 28th, the argument-hearing was postponed to May 4th. On May 4th this court heard the argument and the witnesses who were offered. Since the hearing had not been fully exhausted at that time, additional time was given on May 10th, when I heard further testimony from counsel and from the reporter who had recorded the trial of this case, and again on May 26th by the defendant's calling as her witness, the First Assistant Public Defender.

In the instant motion, the defendant's attack on the verdict is:

(1) that this court erred in making various findings of fact and conclusions of law;

(2) that this court erred in finding that the defendant intentionally and wilfully evaded the law as set forth in the indictment;

(3) that this court erred in determining that various items of evidence resulted in taxable income to the defendant where there was no credible evidence tying her in with the transactions in question;

(4) that the defendant did not knowingly and intelligently waive her right to a jury trial; and

(5) that the period from the beginning of the trial to the verdict was overlong and denied her Sixth Amendment right to a speedy trial.

To bring the processing of the case up to date and as well to supplement such testimony as is required to meet or support the challenge of the defendant in the instant motion, a partial review and some repetition are required of that already stated in the Findings of Fact, Conclusions of Law and Opinion of this court filed on April 1st, 1982. 535 F.Supp. 1230.

As a matter of basic information, the defendant had been the trusted bookkeeper of Micro-T, Inc., in a borough immediately outside the City of Pittsburgh limits. The corporation was engaged in contracting for and constructing radio antennas and microwave towers for industries requiring these throughout the country. The executive officer who took care of the sales' portions of this phase of the business was vice-president Alton Kester, and the office and ad-

ministrative functions of the corporation were administered by vice-president Donald Wood. However, it appears both spent considerable time on the inside of the office and authorized the bookkeeper, the defendant who had become a trusted employee, with not only keeping accounts and retaining withholdings for tax purposes and making tax returns for these, but also with the drawing of corporate checks, that is, those authorized by either Kester or Wood as applied to their respective functions.

Other officers in the corporation, Robert Fay, the president, was primarily the financial backer and seldom interferred with the administration of the business. The secretary, the corporation's lawyer, Donald Lee, was very seldom present in the business.

The defendant was employed by president Fay for the corporation as a bookkeeper in December, 1973. She continued in that employment, and as I now repeat, became a trusted employee, so much so that she was entrusted with not only the writing of checks authorized by either Kester or Wood, but also with the numbering of the checks in the checkwriting machine and with the use of the signature slug containing the names of the authorized drawers of the checks, Alton A. Kester and Robert B. Fay, available only to the officers and to the defendant Anderson. The authorized checks were then written by the defendant and the slug inserted into the machine, making them negotiable instruments.

Although no dissention occurred in the Micro-T, Inc. setup, the defendant made the charge to Wood that Kester included personal expenses in his travels for the company. This matter was referred to the Board of Directors of the company, and the charge was dismissed. As to what happened thereafter will presently appear in the testimony of the defendant as she took the stand in her own defense.

The prosecution in support of the charges contained in the two counts of the indictment presented various witnesses: (a) an Internal Revenue Service representative who testified to what the defendant did file and what she was required to file in the years 1975 and 1976; (b) an accountant who sat in court throughout the trial and after hearing all the evidence made calculations from the evidence and presented testimony on the amounts which should have been returned for income tax purposes in the calendars years 1975 and 1976; (c) the president of Micro-T corporation, Robert B. Fay, employe of the defendant, and the two vice-presidents-directors and executives Kester and Wood—who had authority to approve corporate checks and who testified that the large list of check exhibits introduced into evidence and referred to throughout the trial as duplicate numbered checks which the defendant made and negotiated during the calendar years 1975 and 1976, were unauthorized, invalid and not connected with any company business; and (d) a number of merchants and sales representatives who testified to the fact that the defendant, Ruth M. Anderson, presented the Micro-T, Inc. checks and negotiated them for her personal purposes, and further testified that they had no business with Micro-T corporation.

The testimony of all these witnesses was to the effect that the defendant was a bookkeeper who had been entrusted with the making and negotiating of checks authorized by either Wood or Kester; that when the defendant resigned in August, 1976 the successor bookkeeper was met with shortages and missing records relating to the bank checking account; that the successor bookkeeper discovered that a large deficit existed in the calendar years 1975 and 1976, and that the books could not be balanced; that Union National Bank, the checking depository made micro-film copies of approximately 200 duplicate numbered checks for those years;[1] that none of these duplicate numbered checks were in the record of or disclosed by the books of the Micro-T corporation; that practically all of

---

1. These duplicate numbered checks were returned and they were included amongst all the legitimate business checks of the company.

them related to the purchase of goods and services benefitting the defendant, her son and her sister; that none of the officers of the corporation knew of these checks until the micro-films were submitted by Union National Bank after the defendant had left their employ; that the total of these duplicate numbered checks amounted to $34,363.37 for the calendar year 1975 and $26,751.13 for the calendar year 1976; and that the defendant did not declare or return these amounts in those years as income to her, but additionally had requested refunds in the amount of $137.00 for 1975 and the amount of $430.58 for 1976.

The prosecution in presenting the micro-film copies of the duplicate numbered checks divulged the mechanics used in the making and negotiation. So the prosecution gave me full knowledge of practically every one of the duplicate numbered checks as made, drawn and negotiated by the defendant. She had a pattern of activities when she was authorized to draw a business check. As for example, after first using a check number for a legitimate business purpose and putting a number on it, she would then place that duplicate number on another check payable for her own purpose. One such check from approximately 200 duplicate numbered checks was payable to Canadian Fur Company in the sum of $600.00. (Exhibit No. G1, March 18, 1975). Since none of this testimony was contradicted and presented no inconsistencies, I made conclusions and findings of fact as presented. However, I did not finalize my findings of fact and conclusions of law until I received all of the evidence in the case as a whole.

The defendant took the stand in her own defense and admitted that practically all of the duplicate numbered checks were made and negotiated by her, and that they were not included in the records of Micro-T, Inc., but she said nothing about the duplicate numbered checks missing in the checking account statements returned by Union National Bank during the two years in question. However, she denied any criminal involvement.

Her defense was two-fold: (1) that the checks were gifts from Wood for services which she rendered in attempting to verify the expense accounts of Kester in previous years; and (2) that she had not been paid for those services and was entitled to be paid for them just as an accountant or investigator would be paid, and that she "was not working for nothing."

I did not disregard the testimony of the defendant and the defendant's witnesses. I attempted to reconcile all of it with that presented by the prosecution, but particularly as it related to all the exhibits in the case.

All the findings of fact and conclusions of law in my Opinion of April 1st, 1982, found the defendant guilty beyond any reasonable doubt of violating the charges contained in the two counts of the indictment.

### I and III

It is appropriate then that I discuss here only each of the defendant's present contentions as made in her instant motion. Of the defendant's five-point attack on the verdict, I group number 1 and number 3 contentions for discussion first: (1) that this court erred in making various findings of fact and conclusions of law; and (3) that this court erred in determining that various items of evidence resulted in taxable income to the defendant where there was no credible evidence tying her in with the transactions in question.

The defendant in her instant motion singled out about 10 duplicate numbered checks from the almost 200 duplicate numbered checks admitted as exhibits in evidence and charged that all showed no connection with her as the defendant. As relates to the named mail order houses, Columbia Music Treasures, Exhibit K; Electronics International, Exhibits N1 and N2; Madison House Gifts, Exhibit T; Nerisk Industries, Exhibits V1 and V2; New Process Company, Exhibits Z1 and Z2; Spencer Gifts, Exhibit AA, and Sunset House, Exhibits B1, B2 and B3, this is correct but these are minimal in number and amount.

■ As for the rest, I take these separately as relates to the defendant's charges that "there was no identification of her in dealing with the company involved", and "there was no credible evidence tying her in with the transactions in question". To prove this contention as baseless, I need discuss only a few of the exhibits contained in this pointed-out group. First, Exhibit R was a duplicate numbered check for the amount of $4,332.00, made payable to Joseph Horne Music Center. The prosecution produced Walter Jacobs, a salesman for the Center. He testified that he personally sold four organs to the defendant Anderson, the last of which was paid for by Exhibit R on May 10, 1976, and the organ was then delivered to the defendant at her apartment in the Carlton House. (Tr. pages 136.10 to 136.12). This was not denied by the defendant and no evidence was presented by the defendant to contradict the testimony of salesman Jacobs.

In the matter of Exhibits S1 and S2, these matched up with the Klingensmith Hardware invoices, and these exhibits were made and negotiated on duplicate numbered checks by the defendant. The General Manager of Klingensmith, Trevor Young, testified that he sold the defendant a freezer for the purchase price of $242.72, and that this was paid for by a Micro-T check by the defendant, and that this freezer was delivered to the defendant's apartment at the Carlton House. (Tr. pages 136.47 to 136.50). This was direct testimony for which no defense was offered by the defendant.

Thus, she is incorrect in her charge that the court erred in determining from the evidence in this case that this testimony and the identified exhibits were not sufficiently connected with her; and that the court erred in its conclusions that these items resulted in taxable income to the defendant from all of the evidence as a whole.

The statute by which the defendant was indicted and charged and found guilty states:

"Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony . . ." (7201, Internal Revenue Code).

Our courts have held that it is not necessary to prove every item charged in the indictment, but only that a substantial amount was withheld, and for which tax was evaded. Pursuant to the law, it will be seen, as I stated in my opinion, that there were approximately 70 groups of checks offered into evidence. To comply with the court's principle in this regard, I used approximately 10 of the more substantial amounts which were not returned to the Internal Revenue Service by the defendant as reflected in the above exhibits.

In my Opinion I stated that it was only after considering all of the evidence as a whole that I found "more than sufficient evidence and hold beyond a reasonable doubt that the defendant's failure to report those thousands of dollars of income in 1975 and 1976 was willful, knowing and intentional . . ." (Opinion, page 19). I also stated, ". . . the evidence proved that substantial amounts of those charges in the indictment were withheld from the returns in those years" and "the government was not obliged to prove the exact amount of tax evaded in each of said years". (Opinion, page 18). I stated, "The evidence is uncontradicted that practically all of the duplicate checks were self-benefitting to the defendant, or her son or sister". (Opinion, page 16). I also stated that the existence of the first element, "a tax deficiency was proved beyond a reasonable doubt by the government by overwhelming evidence of the accumulation of thousands of dollars of undeclared income to the defendant as a result of the duplicate numbered corporate checks which she made and negotiated for her benefit and which she admitted taking to the extent of thousands of Micro-T funds . . ." (Opinion, pages 14 and 15).

I remarked that it was unnecessary to detail each of these checks in order that the government might sustain its burden of proof and for that reason I said only a few of the payees of the cancelled duplicate

numbered checks, which had been admitted into evidence, were set forth as an example. Before I enumerated a partial list of checks I said,

"Set forth here are a few of the payees of these cancelled duplicate checks, which the defendant admitted were for her benefit, or that of her family. These show a factual situation as a foundation upon which a determination must depend. While the checks pertain to the interest of the defendant and as some of them bear the defendant's name, and while the evidence connects her personal interest in the bulk of them, ... it is sufficient to detail only a few to exemplify the general character of all payees, amounts and purchases." (Footnote omitted).

I considered all the evidence as a whole and stated: "After considering all of the evidence as a whole, I find more than sufficient evidence and hold beyond a reasonable doubt that the defendant's failure to report those thousands of dollars of income in 1975 and 1976 was willful, knowing and intentional ..." (Opinion, page 19).

However, since the defendant did infer that I did not consider the evidence in the case as a whole, contrary to my statement to that effect, I now show much of the testimony which I did not detail, but which I did consider, for the purpose of determining credibility and persuasiveness, and not to negate the defendant's assertion that the government did not prove the defendant's connection with any of the evidence. The duplicate numbered checks were not used as a basis for establishing the defendant's tax liability or to establish the tax evasion violation. An avalanche of other duplicate numbered checks were admitted in evidence and discussed in my findings of fact, conclusions of law and Opinion of April 1st, 1982 as this evidence established the defendant's covert use of thousands of dollars of the corporate funds which she diverted to her own personal use.

Since there were almost 200 checks, all duplicate numbered corporate checks, issued and the vast bulk of which were established as being made and negotiated by the defendant and channeled into her own use and benefit, it was not incumbent upon this court in its findings of fact and conclusions of law and Opinion to detail each of them, or all of them, since the opinion was already voluminous and the economy of judicial time required more judicious application and preparation of the whole opinion.

A sufficient number of these duplicate numbered Micro-T checks were specifically set forth in the Opinion of this court upon which the court had ample basis under the law to find that the defendant had failed to make returns for substantial amounts of income for tax purposes in both years, 1975 and 1976, as charged in the two counts of the indictment.

Since the defendant has seen fit to bring in other matters in an effort to show a lack of application by the court in determining the nexus between the duplicate numbered checks and the defendant, and of the amounts of money involved as would provide any possible breach of the Internal Revenue Service statute, I deem it appropriate to add additional exhibits and evidence upon which I relied from all of the evidence in this case as a whole to arrive at a determination of the defendant's guilt or innocence of the charges made in the indictment.

One example is Government Exhibit B2, a corporate duplicate numbered check in the amount of $750.00, payable to Ruth M. Anderson and endorsed over by the defendant to Ralph's Discount City. Another example, Exhibit B1 is a Micro-T check in the amount of $211.88, payable to cash and dated December 11, 1975, with the endorsement "Payable to Ralph's Ruth M. Anderson".

As relates to Exhibits E1 through E6, payable to Associates Finance Services in variable amounts totalling $896.21, commencing with April 8, 1975 through October 16, 1975, the defendant contends that she borrowed this money from the Associates for meeting the payroll by Kester's authority on behalf of Micro-T, Inc. (Tr. page 537). It is inconceivable that this company, being the large business that it was, would be

short of funds and forced to borrow small amounts of money through the personal credit of its bookkeeper. However, the defendant's assertions were denied by all of the Micro-T officers in rebuttal and the credibility is weightier without doubt on the side of these officers.

It will be seen that all 20 duplicate numbered checks in Exhibit F1 are endorsed by the payee, Ruth M. Anderson, and total $3,538.37. Before arriving at my final determination, I had searched the transcript in an effort to find a defense to these checks, but none was presented by the defendant. Also, it will be seen that one of these checks was endorsed by Ruth M. Anderson to the order of David Weis, of whom this court takes judicial notice as being a discount jeweler on Smithfield Street in the Mellon Square park area, as well as being located in other places in the city. Thus, the weight of the testimony does not stand in favor of the defendant here in any way and points without a doubt to the illicit use of these duplicate numbered checks by the defendant.

Exhibit F2 is a series of 22 duplicate numbered checks totalling $2,650.00, made payable to Ruth M. Anderson. It will be seen again as with Exhibit F1 that these duplicate numbered checks in Exhibit F2 were all cashed by Ruth M. Anderson. And especially it will be seen that 7 of these duplicate numbered checks were endorsed to the Carlton House for a total of $970.00.

Exhibit I1 is of a similar character and is a group of duplicate numbered checks which require no details. They were made out for the year 1975, payable to cash and all of which, with one exception were endorsed and the signature identified as Ruth M. Anderson for a total of $896.94. Exhibit I2 is a similar group of duplicate numbered checks for the year 1976, made payable to cash and endorsed by Ruth M. Anderson for a total of $620.00.

Exhibit Y1 comprises a group of duplicate numbered checks for the year 1975, payable to Charles J. Nebel, the defendant's son, and endorsed by him in the sum of $4,705.00, with no business connection with Micro-T, Inc. There was evidence by the defendant that he was repaying some money, but whether it was for the home improvement [2] or for the series of checks in Exhibit Y1, was not made clear. The important thing here is that the defendant made these duplicate numbered checks payable to her son.

Exhibit Y2 is a similar group of duplicate numbered checks, totalling $8,100.00, made payable to the defendant's son and endorsed by him, with no business connection with Micro-T, Inc. The total of this group of checks in Y2 is not quite double those in 1975.

I did not particularly omit any duplicate numbered checks including such exhibits as GG1 which is a duplicate numbered check in the amount of $30.00 to the William Penn Association for the account of Ruth Anderson, and a duplicate numbered check, Exhibit GG2, payable to the order of William Penn Association in the sum of $60.00.

II

■ As for the defendant's attack upon the verdict as set forth in point 2, that the court erred in finding the defendant intentionally and wilfully evaded the law as set forth in the indictment, the foregoing, as included in all the evidence as a whole, shows that the defendant knowingly made these duplicate numbered checks, withheld them from the records of Micro-T, Inc.; and knew sufficiently of income tax requirements by the handling of the corporation's income tax withholdings and in making her own returns and in making applications for refunds for 1975 and 1976. In any event, the covert handling of all matters pertaining to the duplicate numbered checks by the defendant is fully set forth in my findings of fact, conclusions of law and Opinion filed April 1, 1982, and needs no further discussion to show that this point of attack on the verdict is baseless of no showing of intentional and willful evasion of taxes.

2. The home improvement was the installation of a fireplace in the home of defendant's son, Charles Nebel. This was mentioned in my opinion at page 7.

## IV

The point 4 attack on the verdict relates to the averment of the defendant in paragraph 13 of her instant motion that "she did not knowingly and intelligently waive her right to a jury trial".

Reference is first made to the pleading itself entitled "Waiver of Jury Trial" which was dated February 9, 1981. It was filed on February 11, 1981. It was signed by "Ruth M. Anderson" and witnessed by "W. Penn Hackney for George E. Schumacher". Mr. Hackney is an assistant public defender and witnessed the defendant's signing of the waiver. Assistant United States Attorney Sandra D. Jordan, consented by her signature on February 11th and it was approved by this court on February 12th.

Mr. Hackney testified at the hearing on May 4, 1982, that Mrs. Anderson did read the document before affixing her signature. And this is what she read in plain words:

"And now, February 9, 1981, I, RUTH M. ANDERSON, having been fully informed of my Constitutional right to a trial by jury in the above-stated case, do hereby waive said right and consent to be tried without a jury by the United States Court for the Western District of Pennsylvania.

Ruth M. Anderson".

She thus acknowledged[3] that she had "been fully informed of [her] constitutional right to a trial by jury . . . . . . [and did] waive said right and consent[ed] to be tried without a jury by the United States Court for the Western District of Pennsylvania". That she had had conversations in this regard and was told to go home and think it over before making her choice will also presently appear in the testimonial evidence which is excerpted from the transcribed records of hearings had on the instant motion.

During the many days in which the bench trial proceeded, I had ample opportunities to observe the defendant and her demeanor in the courtroom. And in fact, I had fur-

ther opportunity to observe her in the post-trial hearing-arguments. I observed and concluded that Mrs. Anderson was an intelligent and a cultured woman, alert and perceptive. During the trial of the case itself, she was simply yet neatly dressed. At the post hearing-arguments she presented herself more noticeably and tastefully attired.

It is inconceivable to me that a woman of Mrs. Anderson's intelligence, education and perspicacity, as shown during the trial of this case, would not have known that she was not sitting in a trial where there was no jury from February 17th to March 3rd, or that she did not know of her constitutional right to have a jury trial, especially after she had read the words in the "Waiver of Jury Trial", as she signed it, and as it was witnessed by Mr. Hackney.

Oddly enough, it is only now for the first time as of April 28th, 1982 that she professes ignorance of her right to a jury trial and of her waiver of that right. During the time the defendant sat in court during the trial of this case and as she testified, she proved that she was alert and a woman of intelligence and discernment. She was an educated person as she herself testified (Tr. page 485, Trial):

"Q. (Mr. Schumacher): What is your educational background?

A. I am a graduate of Perry High School and I went to three years, three nights a week at five hours a night, to Pitt.

Q. When?

A. 1950 to 1954.

Q. What courses did you take then?

A. I took general accounting and public relations."

The defendant took the stand at the May 4th hearing, and after testifying directly upon her counsel presenting a series of questions, she was cross-examined by the Assistant United States Attorney on her qualifications. She in substance stated

---

**3.** Mrs. Anderson, as the evidence will presently show was not physically or mentally handi-    capped, nor an illiterate or uneducated.

again that she had gone through high school, gone to college at night for three years, was a business manager for Micro-T corporation, previous to that had been an accountant for another company and an assistant accountant for John W. Galbraith, although she was called a secretary at that time. She stated that the jobs demanded accuracy and record keeping. She stated that she could read, write and understand the English language. Prior to that her counsel had asked her about their contacts and communications before the trial, but she stated she did not remember signing the waiver of jury trial, although she acknowledged her signature. However, she defended that she signed a lot of papers and said "I can't remember".

She also defended that she was fighting a civil case which required the signing of a lot of papers and so she just placed herself in the hands of the attorneys thinking they knew what was right. She admitted that she met with Mr. Schumacher on many occasions to prepare for the trial; that she remembered discussing the witnesses who were to be called; that she wanted him to secure the services of an accountant to testify in her behalf, and in fact recommended the name of an accountant; that she remembered suggesting calling character witnesses to testify; and that she provided the names of the character witnesses. She further remembered that she had instructed him to call another attorney, William W. Milnes, in the civil case in the Common Pleas Court and to discuss the case and cooperate with him.

When Mr. Schumacher questioned her as to whether she recalled the discussions of having a jury or non-jury trial, she replied "No, I don't remember that either; no". (Tr. pages 13–14, May 4th). The next question is better stated from the record (Tr. pages 12–13, May 4th):

"Q. Do you remember me discussing with you the fact that because of the amount of money involved, because of the fact that there were fur coats and the purchase of rings involved, that a jury might be more likely to decide your guilt or innocence based not on the facts in evidence but on their prejudice or opinions against you?

A. I don't remember that.

.    .    .    .    .

Q. Do you remember being questioned in any way by the Court before the beginning of the trial concerning your waiver of a jury trial?

A. No, I don't remember that, either; no."

After that, Mr. Schumacher asked whether she wanted to present anything to the court, and she said (Tr. page 14) that last Wednesday (April 28th), after the argument-hearing postponement because of Mr. Schumacher's emergency illness, she went with Mr. White, who was there in behalf of Mr. Schumacher, to their office and he informed her of her right to a jury trial; that she did not know this before; that he made her understand that in a jury trial a unanimous vote of all jurors is required to convict; and that after talking with Mr. White and learning of her rights by a jury trial, she would have asked for a jury trial if she had known this before.

After the Assistant United States Attorney cross-examined her on her qualifications, she was asked of her remembering any discussions with her counsel concerning a non-jury trial, she stated that she didn't know of any such discussions. When asked whether or not she noticed that twelve chairs in the jury box behind counsel were empty during the trial and why she never questioned the absence of twelve people, she said (Tr. page 30, May 4th):

"A. I never thought about it. Never, I never even thought about it."

When the court questioned her, she reiterated over and over again in positive fashion that she never knew about her right to a jury trial; and that this knowledge first came to her on the previous Wednesday, April 28th. Then this followed (Tr. page 22, May 4th):

"Q. No one ever talked to you about it?

A. No."

But she had said that her relatives had talked to her about it during the trial, but she didn't talk to her lawyer about it. When asked by the court how it came about that while she knew only for the first time that she was entitled to a jury trial on April 28th from Mr. White, her attorney had stated in the motion for a new trial filed *April 8th* in paragraph 13 that *she requested him to ask for a jury trial*, her answer was started and unfinished. Later she said "Because I signed the thing last Wednesday (April 28th) to say that." But when pressured by the court on Mr. Schumacher's statement (Tr. page 24, May 4th):

"THE COURT: ... You had no idea before, you had no idea that Mr. Schumacher was asking for it? You had no idea you had the right until last Wednesday (April 28) ...?

A. That's right, sir."

Prosecution counsel also questioned her about the averment in paragraph 13 of the instant motion that "she did not knowingly and intelligently waive her right to a jury trial". This followed

(Tr. page 26, May 4th):

"Q. Now, is it your testimony today that you did not know prior to April 8 that you had a right to a jury trial?

A. That's right. I didn't know anything until last Wednesday when it was explained to me, to me by Attorney White.

Q. So that it is your testimony that Mr. Schumacher just made this up and put it in a form which he filed with the Court on April 8?

THE COURT: Without your authority?

A. Well, I placed my authority in Mr. Schumacher.

THE COURT: I didn't ask that. You did not knowingly understand that he was putting that in as a matter of your authority in that motion as of April 8?

A. No, sir, I didn't know."

There was no redirect by the defendant's counsel.

The court then put the question to the defendant of whether or not she recalled at the beginning of the trial that the court had conversations regarding whether there would be a jury trial and of the court stating it would refuse to take the case if it was to be by jury trial, and if so, it would be sent to another judge, and I said "... counsel remember that?" Prosecution counsel, Mrs. Jordan, remembered that and Mr. Schumacher remembered that. The court said (Tr. page 29, May 4):

"That's what I wanted to see, to make sure ... ."

And the court also stated (Tr. page 28, May 4th):

"THE COURT: ... I wanted to make sure about this before I went to trial. It was not recorded, that testimony, but I wanted to make sure.[4]

After that discussion and before the evidence was presented, counsel for the defendant made a motion for segregating the witnesses. I stated "we have no particular reason for it in a nonjury case". (Tr. page A7, February 17th). However, Mrs. Jordan agreed to it and the motion was allowed. That was when I said without a jury and I asked (Tr. page 30, May 4th):

"THE COURT: ... Did you hear that Mrs. Anderson?

THE WITNESS: I don't remember it, sir.

THE COURT: You don't remember that?

THE WITNESS: No, I don't."

When prosecution counsel, Mrs. Jordan, cross-examined her about her knowledge of the meetings between Mr. Schumacher and the United States Attorney's office concerning approval of a non-jury trial, Mrs. Anderson asserted no remembrance of these.

Thus, while I believe we are dealing with human frailties, the defendant, herself, seems to be using the same technique she used in the trial. In the trial she either

---

4. It was not recorded because as a senior judge I had been contemplating taking only non-jury cases, but I did not want it, at that time, to be official. I regret that it was not recorded. It was a simple error of thinking at the time. But I distinctly recalled the entire off-the-record colloquy, verified by counsel for both sides and the court reporter, and also by the IRS agent.

denied certain matters or just simply disregarded them altogether. In the May 4th hearing, when it was convenient for her to specifically remember what she wanted to, she did so by positive and spontaneous responses to those matters relating to the jury trial and its waiver by not remembering or disregarding anything about a jury trial waiver. It was as if the subject matter had been turned over in her mind and she was mentally prepared for her role on the witness stand. The testimony between the defendant and her counsel and the prosecution counsel on the whole presented a distinct conflict. It seemed that she did not want to accuse her counsel of anything, yet there was an effort on her part to place the blame on him, because she did not know what she was doing after she put her trust in him as she did with the attorney in her civil case and so gave it no thought.

Mr. Schumacher then took the stand and under oath testified that sometime in January, 1981 he discussed the case with the defendant of his evaluation based upon the nature of the evidence and the amount of money involved and suggested to her his feeling that a jury might be more likely to decide her guilt or innocence on their prejudices or opinions against her, rather than on the facts in the evidence; and, that he had met numerously with his client in January and sometime prior to February 9th and discussed with her whether or not the case was to go jury or non-jury. He told her to think it over. He testified that on another occasion in February, 1981 interspersed with conversations with the United States Attorney's office, he discussed the matter with the defendant on whether or not the case should proceed by jury or non-jury trial. He gave her the choice. It was while he was similarly discussing the waiver with the United States Attorney's office that Mrs. Anderson "informed" him that she would proceed without a jury. (Tr. page 52, May 4th).

He testified that when he was first appointed to represent the defendant, he recalled advising her of her right to a jury trial, but he couldn't remember when; but that his normal procedure would have been to advise her of all her rights, to a jury trial, to a non-jury trial, to plead guilty or not guilty, and that would have been at or around the time of her arraignment. (Tr. pages 49–50). He stated that he knew that these discussions took place sometime in January and February, 1981 (Tr. page 50). He also stated that he had a number of conversations with Mrs. Jordan because "obviously Mrs. Anderson could not waive a jury trial unless the United States Attorney consented". (Tr. page 50). He also stated that there would have been no reason to discuss a non-jury waiver with Mrs. Jordan unless he first discussed with, and received authority from, Mrs. Anderson to do so. He stated that Mrs. Jordan, being new in the office, "preferred at that point that the case be tried jury rather than non-jury" but that would not control her decision. She would discuss the matter with her immediate adviser, Assistant United States Attorney Thomas Daley, who was originally on the case. (Tr. page 52).

After that Mr. Schumacher contacted Mrs. Jordan and Mr. Daley and they consented to the waiver. Subsequently, the waiver was signed by Mrs. Anderson, and witnessed by Mr. Hackney. It was then consented to by Mrs. Jordan and presented to the court for its approval. Mr. Schumacher testified that he had no distinct recollection of advising Mrs. Anderson of her waiver of jury trial implications, because of the large number of cases to which he had been appointed, and so it was difficult to recall specifics. Nevertheless, he stated:

"But it is my common procedure to advise my client that is involved in a waiver of jury trial that they do have the right to a jury trial ..." (Tr. page 53)

Specifically, he said he states to his clients:

"Do you understand that at a trial, the twelve jurors would all have to agree that you are guilty before you could found (sic) guilty or they would all have to agree you are not guilty before you could be found not guilty; do you understand that if the Government agrees, you

may have a non-jury trial; do you understand that the Government has the same burden of proof; and you have the same rights in a non-jury trial as in a jury trial; do you understand that the only difference between a jury trial and a non-jury trial is that in a non-jury trial the judge decides the facts and decides whether you are guilty or not guilty; and in a jury trial, the jury decides the facts and decides whether you are guilty or not guilty; do you want a non-jury trial?

Those are the normal questions I ask *every client . . .*" (Emphasis added, Tr. pages 53–54).

Mrs. Jordan, prosecution counsel, was sworn and corroborated her conversations with Mr. Schumacher and Assistant United States Attorney Daley. She testified as follows: (Tr. page 57)

"I then spoke with Mr. Schumacher again. In our conversations, I said to him something like, what has she decided, has she made up her mind? And he said to me, he said in so many words, yes, she wants to go non-jury. And he said, 'Well, she thinks she'll be better off with one person deciding her fate as as opposed to twelve people deciding her fate."

And at page 58, Mrs. Jordan stated:

"Yes, I will agree, if she wants it."

Because of Mr. Schumacher's inability to witness the waiver of jury trial, he requested Assistant Public Defender W. Penn Hackney to have Mrs. Anderson sign it. Mr. Hackney testified that he witnessed Mrs. Anderson's signature, and then he was questioned by the court as follows: (Tr. page 41, May 4th).

"THE COURT: All you know is that she read it?

A. Yes, and that I was there at the time."

However, it will be recalled that the defendant denied that she knew what she was signing, but this assertion by the defendant is contradicted by Mr. Hackney's statement that she read it, and by the defendant's answer to Mrs. Jordan when she admitted to her education and ability to read and write English.

As a judge of this court, I have known Mr. Schumacher for many years. I know how he relates to his clients because of judicial experience with him and his client relationship. However, since the defendant denied that she had authorized Mr. Schumacher to assert that she had asked him to raise the right to a jury trial, as the averments are contained in paragraph 13 of the instant motion, then such averments would of necessity have to be by Mr. Schumacher's own ingenuity. Such an averment had to be explained and Mr. Schumacher said that he in no way breached the confidence of his client. The testimony of Mr. Schumacher was as follows (May 10th, Tr. page ——)

"THE COURT: When did Mrs. Anderson first tell you that she didn't understand her right to a jury trial, as you may remember it?

MR. SCHUMACHER: I know that it was discussed in the April 6th, 1982 telephone conversation, Your Honor. I can't recall it ever having been discussed prior to that time."

It is a fact that neither the defendant nor defendant's counsel sitting through a fairly, lengthy trial without a jury, spoke a single word protesting, or questioning, or exhibiting any ignorance of the fact that the trial was proceeding without a jury. The fact is that the defendant did know that the case was proceeding non-jury before the court as the "fact-finder", as that is reflected in the record. When the defendant was about to take the stand in her own behalf at the trial, I advised her of her rights and that she was not compelled to take the stand; nor could anyone compel her to do so. At the May 4th hearing, I brought out this matter of my caution given in the main trial (Tr. page 488) to her, and I asked her if she remembered when I told her it was incumbent upon the government to prove its case to the court beyond a reasonable doubt, and she said she remembered that.

The record then goes on as follows: (Tr. pages 34–35, May 4th)

"THE COURT: 'As a fact-finder, beyond a reasonable doubt, that the charges

which are leveled against you are supported by substantial evidence.' Do you remember that?

THE WITNESS: Yes, sir, I remember that.

THE COURT: Do you know what 'fact-finder' meant?

THE WITNESS: Well, the facts that was given in the case.

THE COURT: And that meant that I would have to make a determination what the facts are; did you understand that, even though you took the tranquilizer?

THE WITNESS: I understood that I was already on the stand.

THE COURT: You understood that?

THE WITNESS: I understood that.

THE COURT: You knew what that meant?

THE WITNESS: That *you were to decide the case.*" (Emphasis added)

It then goes on:

"THE COURT: That I was assigned the case and what else? 'Fact-finder,' what did that mean to you.

THE WITNESS: You were going to decide which facts were true and which ones aren't.

THE COURT: Yes. You knew that. And that was to be beyond a reasonable doubt' you remember that?

THE WITNESS: Yes, sir."

Of great importance is the fact that this court would not have sat in a non-jury trial, if a proper and knowing pleading had not waived a jury trial and had not been timely and knowingly approved by the parties and filed in order to permit the case to proceed as a non-jury trial. Of greater importance is the fact that I was not taking jury trials; that after the case was first called, I pointed out to all counsel and the defendant that I would not sit on the case if there was to be a jury; that I then was presented with the Waiver of Jury Trial and faced the defendant with it and explained it to her and asked her whether she had signed it. With her positive answer, I agreed to proceed with the case non-jury.

It is indisputable that she read the Waiver of Jury Trial document before she signed it; that she understood its meaning; that she did not object to it; that she knew from her suggestions to her counsel about an accountant whom she named to sit in the case and from her conferences with her attorney to put her fate in the hands of one person rather than twelve before the trial could start; that after the call of the case in open court she acknowledged before both counsel and before me that she would proceed non-jury when I stated that I would not accept the case if it were to be a jury trial; she knew that I was to be the fact-finder and what a fact-finder was in the case; and that she asked no questions and raised no objections at that time or throughout the entire trial as she sat behind her counsel for many days without the presence of a jury.

The court granted the request of the defendant to schedule an additional hearing for the calling of First Assistant Public Defender Thomas White, with whom the defendant had had a conversation after the April 28th postponement of the argument-hearing, because of Mr. Schumacher's emergency illness. White testified that *she had presented the question to him* of whether or not she was entitled to a jury trial and her understanding that a majority could convict rather than by agreement of all. White then said he explained to her all matters which a lawyer is required to explain to a client before advising a defendant to accept or not to accept a non-jury trial.

As White continued to testify, I questioned him in regard to that point, he said it was he who brought this matter to Mrs. Anderson's attention. And when I continued to question him, it was my belief that he was both her informer and educator. When I asked him whether he knew of paragraph 13 in the motion of April 8th, where Mr. Schumacher had averred that Mrs. Anderson had directed him to make a request for a jury trial, White admitted ignorance. He also admitted that he did not read the motion. When I confronted him with the question of the inconsistency

Page 674

**674**

between the averment of the April 8th filing and his testimony that he first informed the defendant on April 28th, I asked him to explain the inconsistency. He had no reply.

I asked him further about the length of his association in the Public Defender's office with Mr. Schumacher and he stated he had been in that office since 1977, and as a law associate from the time of their admission to the Bar in 1958. On his failure to explain the discrepancy between the motion's filing on April 8th and his statement of what occurred with Mrs. Anderson on April 28th, I asked him about the credibility of Mr. Schumacher. He asserted that Mr. Schumacher's credibility was excellent. Based upon the testimony of Mr. White, it

**5.** "THE COURT: And did you know that Mr. Schumacher said that it was Mrs. Anderson what (sic) told him to put that in the motion?
THE WITNESS: That, I wasn't aware of, Your Honor.
THE COURT: You didn't read the motion?
THE WITNESS: I hadn't read it.
THE COURT: Had you read the motion, you would have been aware of it?
THE WITNESS: I would have been aware of it.
THE COURT: And if Mr. Schumacher says he did have Mrs. Anderson tell him that, would you doubt him?
THE WITNESS: No, Your Honor, I wouldn't doubt him.
THE COURT: And if he swore to that, would you doubt him?
THE WITNESS: No, I wouldn't doubt him.
THE COURT: If he were to come into court and under oath indicate that he had had conversations with Mrs. Anderson as to whether or not there should be a jury trial, because of the subject matter that was involved, and the possible prejudice, and told Mrs. Anderson to go home and think it over, and that she did that, and that afterwards when she came back in the office again, that she would prefer to have the matter in the hands of the judge, one person who wouldn't be prejudiced as against twelve persons, would you believe Mr. Schumacher under oath?
THE WITNESS: Well, Your Honor, it has always been my opinion that Mr. Schumacher is one of the most honest I've ever met.
THE COURT: That has been mine, too, highly honorable.
THE WITNESS: Yes, sir."

.    .    .    .    .

THE COURT: And you associated together in an office?
THE WITNESS: We were after that, Your Honor.

will be better understood from the transcript.[5] (May 26th Hearing, Tr. pages 56–58; 62–63).

The prosecution then presented Robert Hackett, the Internal Revenue Service agent who had been in court throughout the trial. He said the defendant was in the courtroom at all times throughout the trial, and that he remembered me commenting that I did not take jury trials and that if it was going to be a jury trial, it would have to be reassigned. He testified that he remembered the defendant being faced with the waiver of jury trial which she execute and her statement that the signature was hers.[6]

THE COURT: And during that time, have you ever known him to be one whose word, not under oath, should be doubted?
THE WITNESS: No, Your Honor. I have never known that.
THE COURT: And especially under oath?
THE WITNESS: And especially under oath.
THE COURT: And so, if Mr. Schumacher did testify to the fact that he had these conversations with his client regarding strategy, witnesses to be called, and whether there should be a jury trial, and the suggestion by Mrs. Anderson that she wanted an accountant and named the accountant, would you misbelieve him?
THE WITNESS: No, I don't misbelieve him about anything.
THE COURT: I would have a right to believe him, would I not?
THE WITNESS: Yes, Your Honor."

**6.** Testimony of Robert Hackett as questioned by Mrs. Jordan.
"Q. Do you remember the discussion the court had as soon as the trial started concerning this waiver?
A. Yes, I do.
Q. Is that consistent with what you've heard the court say today?
A. Yes, it is.
Q. Concerning the fact that the judge does not take jury cases, and that if it is going to be a jury, it would have to be reassigned?
A. That is correct.
Q. Do you remember anything further in line with that conversation, about facing the defendant?
A. I know that Mrs. Anderson was here at the time that discussion took place—
THE COURT: And she was faced with the waiver of jury and said the signature is hers.
A. Yes. I don't recall seeing the document—

When I asked the defendant at the end of the hearing whether she had any questions, she stated that she did, and with some clarification the transcript is to this effect (May 26th hearing, Tr. pages 77–79):

"MRS. ANDERSON: I would just like to ask you, Your Honor, I am a little confused. In this trial by jury, or by judge, if I so elected to had (sic) chosen a judge, and it says here that the prosecution has the option to deny it, . . . she [Mrs. Jordan, Assistant United States Attorney] testified that she was against it by a judge because she was—strictly wanted a jury trial for experience, do you mean this is the consideration that a defendant gets regardless of their—

.    .    .    .    .

THE COURT: . . . If the government didn't agree to the waiver then there could be no non-jury case. It would have to go before a jury. Does that answer you?

MRS. ANDERSON: You mean, regardless of why she chose the jury?

THE COURT: . . . The question is whether or not we should consider her reason, is that it?

MRS. ANDERSON: If that would have been considered, I would have been denied it by a judge because she wanted a jury?

THE COURT: Yes, if she wanted a jury, you would have to go before a jury. That's right.

MRS. ANDERSON: If she wanted a jury, I would have been denied—

THE COURT: You would have been compelled to go before the jury. Now does that answer your question?

MRS. ANDERSON: I just wanted to know. That was—

THE COURT: That's the answer to your question." [7]

These questions and her attitude impressed me as she addressed the court. I

THE COURT: No, I had it on the bench here and asked her to—
  A. Yes, I recall the question."

was left with the thought that as of that moment Mrs. Anderson still did not want a jury trial. If that is a fact, the inference follows that she did not want a jury trial when she signed the waiver with full knowledge of her rights and of the fact that her attorney had been in conference with the United States Attorneys for the purpose of getting a non-jury trial because that was what she wanted and that that was discussed with Mr. Schumacher before the trial. I repeat, her demeanor at the time when she asked the question, showed that she was indignant over the fact that Mrs. Jordan could have stopped her from getting a non-jury trial.

It is noteworthy that counsel for the defendant cited no authority which might undermine the process used by the defendant and the Assistant United States Attorneys in providing a waiver of jury trial, and the interrogation of the defendant by the court before trial and go before this court as a "fact-finder". The law is plain as to what this court did in ascertaining the voluntariness and knowledge of the defendant immediately after the case was called for trial and proceeded as a bench trial after being instructed by the parties to do so rather than to send it to another judge for jury trial.

■ There is no doubt that the defendant did sign a waiver of jury trial and that she had read it before signing it. Only after it was witnessed and approved by the Assistant United States Attorney and the court, did it become an effective waiver in accordance with law. An effective waiver of jury trial under Federal Rule of Criminal Procedure 23(a) requires (1) that the waiver be in writing; (2) that it be approved by the court; and (3) that the consent of the government be obtained. *Moore's Federal Practice*, Vol. 8A, § 23.03(2) 2nd Ed. 1981.

7. I am fully aware of the law on the suggestion that I could have overruled the objection of the prosecuting attorney had I had ample reasons to do so. But there was no material reason for discussing that with the defendant at that time.

■ Although some courts have indicated that more questioning would be desirable, the courts on the whole have indicated only that in the waiving of a jury trial there must be "essential factors of knowledge of the right, the free exercise of an uncoerced will, and conduct or action known to the accused which evidences an intent to waive". *United States v. Marcello*, 423 F.2d 993, C.A. 5, 1970.

■ Such reasoning is generally followed in these cases, that interrogation of the defendant is not required under Federal Rule of Criminal Procedure 23(a) in a waiver, although in the instant case I did inquire of the defendant as to her signature and her desire and willingness to proceed before this court in a non-jury trial. Thus, her acknowledgment of the written waiver in open court constituted literal and full compliance with Rule 23(a). *United States v. Hunt*, 413 F.2d 983, C.A. 4, 1969.

This also receives support from *United States v. Kidding*, 560 F.2d 1303, C.A. 7, 1977, where the defendant had not originally signed a waiver of jury trial in the documentary form, but where the government later presented a motion to supplement the record and presented a statement signed both by the defendant and trial counsel to the effect that the defendant was waiving his right to a jury trial and chose to proceed to trial by the court. Chief Judge Fairchild in his opinion said that it would have been helpful to any determination on appeal of voluntariness of waiver and also to have the record reflect that the defendant was interrogated by the trial judge on the issue of voluntariness prior to the acceptance of his waiver. The court said:

"... we do not believe that such procedure, however desirable, is compelled by Rule 23(a) Fed.R.Crim.P. or by the Sixth Amendment, id. and thus, we do not find the failure of the trial judge in this case to conduct such an interrogation of defendant to warrant reversal of his conviction. Accordingly, on the basis of the written waiver, signed by defendant Kidding and his counsel, and in light of the fact that nothing in the record tends to impeach the recitations made in the waiver, we are satisfied that there was a voluntary and intelligent waiver of jury trial." (560 F.2d at page 1312).

The formal pleading in documentary form of a waiver of jury trial is in itself one which must be considered as having validity. In *United States v. Goodwin*, 446 F.2d 894, C.A. 9, 1971, the court said:

"... Appellant and his appointed counsel signed a jury waiver which is valid on its face and there is nothing in the record to indicate that his representation by appointed counsel was so gross on its face as to amount to a denial of due process."

■ The court is aware of the fact that if a defendant in waiving a jury trial has a lack of education or has some difficulty in understanding, that it is appropriate that interrogation be had, so that the court might be aware of the realization of the defendant's act in waiving a jury trial, such as in *United States v. David*, 511 F.2d 355, C.A.D.C., 1975. Here the court required a colloquy with the defendant where the circumstances or manifestations by the defendant either prior to trial or during trial were such as would "cast doubt on the validity of a given waiver". *United States v. David*, supra, at page 361.

But in the instant case there were no such circumstances or manifestations by the defendant, either prior to or during the trial. As previously stated, the defendant had a high school and three-year night college education and much business training. She was mentally alert with the ability to discuss her case with clarity, even though with considerable ambiguities as she testified in her own defense.

In fact, it would seem that our federal courts have had cases similar to ours where an advantage is sought by a non-jury trial, as in the case of *Jackson v. United States*, 394 F.2d 114, C.A. 5, 1968 where it was held:

"We also agree with the ruling below that the evidence in the present case does not warrant a finding that appellant's waiver of jury trial under Rule 23(a) of

the Federal Rules of Criminal Procedure was not freely and voluntarily executed by him personally. The record is clear that there was no compulsion on appellant to execute such a waiver and that he did so as a matter of *trial strategy*, with the advice of retained counsel, *believing he had a better chance to defend the accusation before a judge than a jury.*" (Emphasis added, at page 115).

Accordingly, I may say what is said in *Ciummei v. Amaral*, 493 F.Supp. 938, 940 (D.C.Mass., 1980), aff'd. 636 F.2d 1199, C.A. 1, 1980, cert. den. 451 U.S. 989, 101 S.Ct. 2327, 68 L.Ed.2d 848 (1981):

> "Against this background, the court concludes that constitutional requirements are met when the record as a whole supports a judge's determination that a competent defendant has waived a jury trial knowingly and voluntarily. The constitution does not mandate a particular ritual as a predicate to such determination."

From all the evidence presented before me, as a whole, I find it most difficult to believe the defendant now, first, that she learned about jury trial rights from relatives, without naming them and not raising that point with Mr. Schumacher. That leads me to believe that what he said is true. Second, I find it hard to believe her when she says that she learned it for the first time from Mr. White on April 28th, twenty days after her attorney had said in the instant motion, that she had requested him to assert her ignorance of her right to a jury trial. The record shows that her counsel was at all times under her beck and call and complaint to all the requests she would have made. So, I conclude and find that the defendant knew of her rights to a jury trial before she signed the waiver; that she was unwilling to let twelve jurors hear about her adventures in the fur, jewelry, organ, crypt for herself, annual apartment rent, fireplace for her son and other such businesses; and that she was reluctant to have these sprees heard by twelve jurors. Thus I conclude and find that upon the advice of her counsel, she directed him to have her case come before one person because a jury might be more likely to decide her guilt or innocence based not on the facts in the evidence, but on their prejudices or opinions against her; that she voluntarily and knowingly desired a non-jury trial and that she waived her right to a jury trial when she signed her name to the waiver after reading it; that she concocted the plan based upon what she already knew of the right to a jury trial and other matters which she had previously learned from Mr. Schumacher when she waived her right to the jury trial, for the purpose of defeating a decision of this court as a "fact-finder", with all of which she had been cognizant.

From all the evidence as a whole which I allowed in the argument-hearings on the present motion for a new trial, I am convinced beyond any doubt that the defendant knew what she was doing before the trial and throughout the trial of her rights and of her agreement to place her fate in the hands of a "fair-minded" judge instead of a "possibly prejudiced" panel of twelve persons, and that her attempted support of her contentions of lack of knowledge and voluntariness to waive a jury trial is lacking in credibility and evidentiary weight.

## V

■ The defendant's fifth point of attack on the verdict is that her Sixth Amendment right to a speedy trial was infringed because of delay between the beginning of the trial and the filing of the ultimate decision. She cites no authority to support her contention that the Speedy Trial Act is to be calculated from the beginning of the trial until the final verdict in a non-jury trial. In fact, she does not allege that her trial did not commence and proceed speedily within the time limits imposed by the Speedy Trial Act, 18 U.S.C. § 3161 et seq. Nor does she cite any authority for her novel contention.

■ While a defendant's right to a speedy trial is guaranteed by the Sixth Amendment, it is applicable in situations of excessive delay only in cases between the institution of indictment, prosecution and trial. *United States v. Marion*, 404 U.S. 307, 320, 92 S.Ct. 455, 463, 30 L.Ed.2d 468 (1971).

None of this is applicable to the instant case because the defendant did receive a speedy processing of her trial from the very beginning. As for the defendant's charge of delay, that occurred primarily from the beginning of the case because of the defendant, herself, or her counsel in maneuvering for various financial supports or to counsel's illness.

The Grand Jury indictment was presented December 4, 1980.

Notice was given on December 30, 1980, setting a jury trial for January 19, 1981.

On January 19th, the defendant filed a motion to continue the trial and that motion was granted to February 9th.

On February 3rd, this court was advised by the defendant's counsel as is recorded in our Standard Diary, 1981 as follows: "4:50 Attorney Schumacher advises that they have agreed to go non-jury. Counsel to get consent for non-jury filed by Monday."

On Friday, February 6th, our Standard Diary, 1981 states that this court was advised by Public Defender George Schumacher's secretary "George is ill. Notified U. S. Attorney Jordan today. Judge says to advise him (the judge) when George is ready, or better, for trial."

On February 11th, the jury trial waiver was presented to the court for approval, after it had been signed by the defendant, Ruth M. Anderson, and after she read the document and it was witnessed by W. Penn Hackney, an Assistant Public Defender, for George E. Schumacher on February 9th, and as approved by the Assistant United States Attorney, Sandra D. Jordan, on February 11th. After consideration it was approved on February 12th and filed February 12th.

In the interim a motion for continuance had been filed by the prosecution which I denied. On February 13th, the defendant filed a motion for continuance because of her counsel's illness. This motion was not acted upon and the case was scheduled for trial which started February 17th and ended on March 3rd.

The court reporter filed the complete transcript on June 24th. Thereupon both counsel requested time for filing proposed findings of fact and conclusions of law and briefs.

July 20th, the prosecution filed its proposed findings of fact and conclusions of law.

August 6th, the defendant's counsel filed a motion for extension of time to file findings of fact and conclusions of law and that was allowed.

August 26th, the defendant's proposed findings and conclusions were filed, and the defendant allowed ten more days to file the brief.

The court was moved into granting later submission of findings, conclusions and brief to permit the defendant to make an appropriate defense for the reasons contained in Document 32, "Motion for Extension of Time to File Defendant's Proposed Findings of Fact and Conclusions of Law" filed August 6, 1981:

"While this matter was pending the following facts occurred within the Federal Public Defender's Office that have precluded the detailed analysis necessary to file the Defendant's Proposed Findings of Fact and Conclusions of Law:

(a) George E. Schumacher was appointed to represent Charles P. Kellington, the principal Government witness in a conspiracy-murder for hire ring in cases pending before this Court, the Court of Common Pleas of Allegheny County, and in related matters pending in the State of Florida and elsewhere.

The representation of Mr. Kellington during the course of his testimony before the Coroner's Solicitor, his cooperation with numerous law enforcement officers, and his future testimony before various Grand Juries, has created a substantial strain on the time of the Federal Defender to devote to other matters.

(b) George E. Schumacher has been appointed to represent Charles Edward Graves at Criminal No. 80–170 Erie,

which is pending for jury trial at the beginning of the next term of court in Erie, Pennsylvania.

(c) George E. Schumacher has been appointed to represent Peter Paffen at Criminal No. 81–72, in a complex fraud jury trial estimated to last approximately four weeks, which is pending trial before Judge Cohill.

(d) Changes of personnel and an increase in the number of appointments has created an additional strain on the personnel of the Federal Defender's Office which replacement (sic) are being hired and trained.

Commitments for family vacation plans during the month of August had been made prior to the time that the problems set forth in the next preceding paragraph occurred."

August 25th, counsel for the defendant submitted Findings of Fact and Conclusions of Law. August 31st, counsel for defendant submitted Supplemental Proposed Findings of Fact.

September 9th, a supporting brief was presented by the defendant.

September 15th, the government submitted a reply brief opposing the defendant's proposed findings of fact and conclusions of law.

More than six months elapsed here after the close of the trial on March 3rd. As for the reasons of some of the postponements, I also am aware of the fact that counsel for the defendant was not in the fullest health at the time and I was sympathetic to his condition and respected both him and his client, even though it meant delay, and even though it was caused by them.

The latest is the Motion for Judgment of Acquittal and Motion for a New Trial which was filed on April 8th and for which I set the argument and hearing date on April 28th. On the morning of the argument my secretary was advised by Mr. Schumacher's secretary that Mr. Schumacher was suffering from profuse nose bleeding which had started the night before and that he would be unable to appear for the argument-hearing. I then requested one of his assistants to be present in court and the matter was recorded. I immediately reset the argument-hearing for the following Tuesday, May 4th, at which time all parties would appear to pursue the motion and its defense. The argument-hearing was heard on May 4th with all parties present.

The court is, and over all the past many years has been, highly cognizant of the necessity of speedy processing of criminal actions, particularly. At the same time it must expedite all matters which come to it for attention and disposition in order to maintain its calendar which is constantly moving. It is no pleasure for this court to have matters become delinquent, since the court is required to report to the Administrative Office on a quarterly basis, as well as provide reports of delinquent cases. While all counsel with matters before me were busy with other clients, I was also required to reconcile my functions with their business schedules. Practically all matters, some more, some not at all, involved motions, arguments, status conferences, pretrial conferences, special proxy injunctive proceedings and their processing from January 1 to March 22, 1982, research of the facts and law, and the writing of opinions, in addition to this court's general business.[8]

---

8. This court was not idle during the accused "thirteen month" period to which the defendant attributes procrastination to this court and so depriving her of a speedy trial under the Sixth Amendment. The record maintained in the office of the Clerk of Court shows that from the date the case was first scheduled for trial in February, 1981 through September 1, I terminated 82 cases and was assigned 116 additional cases, with 112 cases pending. From September, 1981 to the end of April, 1982 I terminated 98 cases and was assigned 115 additional cases, leaving me at the end of April, 1982 with a total of 114 cases pending. The total terminations for the entire period of "thirteen months" during the processing of the defendant's case was 299. This compares favorably with all the other judges of this court, both active and senior.

Thus, it cannot be said that I had been procrastinating in the processing of the defendant's trial and its determination. However, using judicial consideration, I held up the decision for four weeks while the defendant's counsel was engaged in a multiple defendants' criminal

In addition to its regular busy schedule, I was required to expedite two remands from the Court of Appeals for supplemental facts, and these required time and effort for the eventual opinions of clarifications. If counsel or the defendant was concerned about any delay, it is obvious that no one made any effort to bring this to the Court's attention, as this is reflected in the Standard Diary which is maintained by the secretary and verified by the docket entries in the office of the Clerk of Court. Thus, I proceeded in an orderly fashion, and diligently and conscientiously from the time the case was referred to me until my final determination on April 1, 1982. It is plain that the bulk of the delays were occasioned primarily by the defense. In processing the cases assigned to me, the instant case was not disregarded nor was the defendant's rights neglected, since the case was processed judiciously. I was cognizant of all the defendant's rights under the Sixth Amendment[9] and I observed this Amendment's mandates as the record shows. I was fully aware in the present instance, as I have always been, of the defendant's rights so that she might be accorded all to which the law and the circumstances entitled her as a defendant. Particularly, I was also concerned about all the circumstances surrounding her, which might have in any way prejudiced her rights. I was aware of none and none was brought to my attention. Even the fact that she was continuing in employment was testified to by the defendant at one of her post hearings.

Here I verify the statement of counsel for the defendant that there is no case stating authority for the point which she raises in the fifth attack on the verdict of dilatoriness on the part of the processing of the case from its start to its verdict.[10] However, some relevance appears in cases which consider protracted periods of time between the verdict or pleas of guilty and sentencing. I cite these only for any similarity they may present to the instant case.

In *United States v. Tortorello*, 391 F.2d 587, C.A. 2, 1968, the defendant pleaded guilty to a conspiracy count and requested immediate imposition of sentence, after he had testified against the co-defendant. After a delay of almost three years, the court entered a judgment of conviction based upon his plea. The defendant asked the Appeals Court to hold that when a sentence is so unreasonably delayed and because the defendant might have had a concurrent sentence with one he was then serving, he was prejudiced by the delay. Accordingly, he claimed the court lost its power to impose a prison term.

The Court of Appeals stated at page 589: "Since we hold that under the circumstances of this case, the lengthy delay was not unreasonable, we find it unnecessary to consider the appropriateness of this novel remedy which appellant suggests."

The cases, generally of delayed sentencing, consider the circumstances and whether there is substantial prejudice to the defendant, whether there is a positive request for expedition of judgment by competent defense counsel, and whether there is any purposeful or oppressive delay on the part of the government in delaying the sentencing. It is the orderly expedition and not

case before another member of this court, so that when he was free of that obligation he could give his client, Anderson, the attention she would desire.

9. Amendment 6. Rights of the accused.
"In all criminal prosecutions, the accused shall enjoy the right to a speedy trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory

process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defense."

10. On the national scale, the 1981 Annual Report of the Director, Administrative Office of the United States Courts, notes that in the period of July 1, 1980 to June 30, 1981, 59 non-jury cases were held for decision over one year (page 155). In addition, 1.031 criminal defendants who were deemed "triable" had cases pending for longer than one year (page 112).

the mere speed which is the essential ingredient in the right of a defendant to a speedy trial under the Sixth Amendment. *Hodges v. United States*, 408 F.2d 543, 550, C.A. 8, 1969.

Nothing in the instant case shows that Mrs. Anderson was judicially prejudiced or deprived of any right because of the length of time between the presenting of the supplemental findings of fact in September, 1981 and of the filing of the verdict on April 1st, 1982, because the circumstances of this case required it.

The court has considered many cases of delay between the verdict or plea of guilty and sentence, such as *Lott v. United States*, 309 F.2d 115, C.A. 5, 1962, where there was a delay of approximately 90 days and the court said:

> "We see no impropriety, indiscretion, injury or denial of any rights whatever by the delay ... Appellate courts must assume, in the absence of anything in the record to the contrary, that delay in pronouncing sentence was for a lawful purpose in the orderly process of handling the case." (309 F.2d at page 122).

That portion applies here by reason of the fact that after September, 1981 I was busily engaged in processing the findings of fact as requested by counsel, in the making of conclusions of law in accordance with the law; and researching the transcript with all its numerous exhibits. It is unnecessary that I cite any other cases of similar nature, other than *Welsh v. United States*, 348 F.2d 885, C.A. 6, 1965.

Under these circumstances, the defendant, Ruth M. Anderson, received a speedy trial in accordance with the circumstances and the law.

Accordingly, the contentions of the defendant (1) that this court erred in making various findings of fact and conclusions of law; (2) that this court erred in finding that the defendant intentionally and wilfully evaded the law as set forth in the indictment; (3) that this court erred in determining that various items of evidence resulted in taxable income to the defendant where there was no credible evidence tying her in

with the transactions in question; (4) that the defendant did not knowingly and intelligently waive her right to a jury trial; and (5) that the period from the beginning of the trial to the verdict was overlong and denied her Sixth Amendment right to a speedy trial, are without either authority or merit.

The Motion for Judgment of Acquittal and Motion for New Trial will be denied.